THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HENRY LEE HARRIS, Defendant-Appellant.

Second District    No. 2—92—0932

Opinion filed May 10, 1994.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford, and Joel J. DeGrazia, of Elmhurst (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

Defendant, Henry Lee Harris, appeals, contending the trial court erred in limiting his right to show the bias or credibility of the State's complaining witness by cross-examining the witness on his alleged gang membership and by presenting evidence of a pending charge against the witness' cousin which also involved the use of a firearm on the same date as the offense charged against defendant. We affirm.

Defendant was charged by indictment with attempted first-degree murder (count I) (Ill. Rev. Stat. 1991, ch. 38, pars. 8—4(a), 9—1(a)(1) (now 720 ILCS 5/8—4(a), 9—1(a)(1) (West 1992))) and aggravated battery using a firearm (count II) (Ill. Rev. Stat. 1991, ch. 38, par. 12—4.2(a) (now codified, as amended, at 720 ILCS 5/12—4.2(a) (West 1992))). The charges arose from a confrontation in which defendant shot Mantilla Lamar Simmons with a pistol on August 10, 1991. After a jury trial in December 1991, defendant was found not guilty of the attempt offense, but guilty of the aggravated battery offense. Following the trial court's denial of his post-trial motion, defendant was sentenced to a 10-year term of imprisonment, and he filed this timely appeal.

At trial, 26-year-old Simmons, the State's complaining witness, testified that, on August 10, 1991, he was living with his girlfriend,

DeAngela Williams, at 258 Chestnut Court in Rockford, Illinois. Defendant's girlfriend, Janice Walker, and her son had been living with Simmons and Williams during the prior month and she was paying some of the rent.

On August 10, Simmons drove with his cousin, Darnell Leavy, to defendant's house on Avon Street because Simmons wanted to talk to Janice Walker. Simmons went into defendant's house by himself, gave Walker her clothing, and asked her for the key to his and Williams' apartment. Defendant made some "smart" remark to Simmons, who replied to defendant that he did not have to speak to him in that manner because he was not a child. Walker gave Simmons his key, but said she had some money coming back to her. Simmons replied that she was not getting anything back. He then returned to his apartment on Chestnut Court. After he got home, Simmons saw defendant pull up in a car with Walker. After defendant parked the car on the street, Walker went into the apartment and talked to DeAngela Williams. Simmons was outside the house when Walker came out angry and saying she would be back. Simmons said she would not get in.

Simmons was standing outside in the porch area near the door of his house and was looking down the hill. He turned around and, as he did so, he saw defendant, who had left the car, approach the house and pull out a gun from behind himself. As soon as Simmons saw the gun, defendant began shooting, and Simmons ran into the house. Simmons stated defendant had a .22-caliber handgun. There was no one else present at this point. Walker had left and gone toward Concord from the area where defendant's car was parked.

Simmons did not immediately feel himself being hit by a bullet. When Simmons got into the house, he began to feel dizzy and he saw the blood as he stopped near the couch. There were two bullet wounds. The first bullet entered the right part of his shoulder in the back and the second went into the mid-section of the lower right side of his back. After walking through the living room, Simmons fell onto the kitchen floor. Simmons claimed that he did not have a gun and did not ever point a gun at defendant. He denied that it was his gun that defendant used. He did not see anyone with a shotgun.

Simmons did not have a prior relationship with defendant nor did he have any problems with him, but he had spoken to him before. Defendant had come to Simmons' apartment to see Walker while she was living there. He identified defendant in open court as the shooter. Simmons described his injuries and stated he had surgery three times as a result of the shooting. Simmons admitted that he had been convicted of burglary and armed robbery. He also admitted he had been drinking about a half-pint of gin on the day of the shooting.

On cross-examination, Simmons said he and defendant had not fought before, and he had nothing against defendant when he went to bring Walker's clothes. Simmons' cousin Darnell stayed in the car during the visit to defendant's house. Simmons denied he was angry when he spoke to Walker. Simmons initially went into his own apartment when he returned to Chestnut Court, but he was standing outside when defendant arrived a short time later and got out of the car with Walker. Darnell was not present when Simmons got shot; he had left after they returned to the Chestnut Court apartment. DeAngela Williams was in the kitchen of the apartment with Jeannetta. Defendant stayed outside walking around; there was no fight between Simmons and defendant. Walker walked past Simmons and went into the apartment where she stayed for about 10 to 15 minutes. Simmons did not hear any commotion inside the house, and he did not argue with her when she came out. After she walked outside past Simmons, he saw defendant standing about 10 feet away with the gun. At this point, Simmons tried to run into the apartment.

Simmons denied that he had a .22- or a .38-caliber handgun or a sawed-off shotgun on August 10. He knew that it would be a violation of his parole status to have a firearm in his possession. Simmons denied telling Detective Wagner on August 15 that he and defendant had struggled over the handgun and that was why Simmons' fingerprints were on it. He denied asking whether he should talk to a lawyer during that questioning by police. Simmons also testified that Darnell was not present during or after the shooting and did not have a shotgun; Simmons denied loaning a gun to anyone in the two months prior to the shooting. He did not hear any loud blasts after he was shot.

When defense counsel asked if Simmons was a member of the Disciples street gang, the State objected, and further arguments were heard outside the presence of the jury. The State urged that the defense was trying to link Simmons to his cousin Darnell, who was alleged to be a gang member; and that the issue of gang membership was irrelevant, highly prejudicial to the State, and would serve to confuse the jury. Defense counsel argued that the issue was relevant because Simmons had advised the police that he was a Disciple member and that Darnell Leavy was a member of the same gang. The defense believed that it was Leavy who had a shotgun that night, and he was currently charged in another case with having the shotgun and firing it. He argued that gang membership showed why Simmons lied about Leavy's being present with the shotgun and firing it. Not only were they cousins, but they were also gang members.

When the court asked why gang membership would necessarily cause Simmons to lie, the defense maintained that Simmons lied to protect his cousin because of their gang association. The State interjected that defense counsel could challenge Simmons' credibility merely on the basis of their relationship as blood-related cousins. The State argued that there was the risk of confusing the jury and that there was no evidence that there was any type of gang retaliation or gang activity related to the shooting of Simmons. Defense counsel replied that there was evidence that, later that evening after the shooting of Simmons, Leavy shot at defendant's son in retaliation.

The State objected that a shooting later in time was irrelevant, but it would not oppose the introduction of evidence of a shotgun blast which occurred immediately after Simmons was shot. The court opined that the issue of gang membership was not relevant because there was no evidence that the shooting of Simmons was the result of gang activity. Furthermore, it did not appear to the court that gang membership materially affected the credibility of the complaining witness regarding the testimony that his cousin was not present at the time of the shooting. In the absence of evidence that Simmons' shooting was the result of gang activity, the court sustained the objection to this line of questioning.

When Simmons' cross-examination continued, he agreed that Darnell Leavy was his good friend as well as his cousin. Over the State's objection, Simmons was allowed to admit that he knew that Darnell was charged with possessing a shotgun on the evening of the shooting; Simmons further admitted he knew that if he testified that Darnell had a shotgun that testimony would be used against him. In response to defense counsel's question that he would not want to testify to anything that would be used against his cousin, Simmons replied, "It has nothing to do with that." Simmons testified that he heard the gunshot when he turned to run into the house. He said nothing to anyone at that time, and there was no one in the doorway when he ran in. He denied seeing Darnell at this time. DeAngela was in the kitchen with Jeannetta.

On redirect examination, Simmons stated that, when Detective Wagner spoke to him on August 15, Simmons was under medication, was sleepy, and was not thinking clearly. He never saw Darnell with a shotgun on August 10, nor did he hear any shotgun blasts, but he did hear the handgun.

DeAngela Williams testified that she was Simmons' girlfriend on August 10 and that they had been living together at Chestnut Court. At about 5:30 p.m. that day, she was in the apartment with Jeannetta. Simmons came into the apartment just before he got shot.

Williams did not see Darnell Leavy then, but had seen him earlier that day. Williams was doing laundry in the kitchen when Walker came in and asked "what was up." Walker and Simmons argued back and forth, and Walker said, "I'll be back." Simmons replied, "Well, you won't get in."

While Walker was going out the door, Simmons walked to the door, and then Williams heard a gunshot. When Simmons turned around, Williams saw blood squirting out of his neck and she started screaming. Simmons did not have a gun. Williams did not see who shot Simmons, nor did she see Simmons go out of the apartment; she was folding clothes, and her attention was focused on the laundry. When she looked up, Simmons was standing in the doorway. When he came into the kitchen, his eyes rolled to the back of his head, and he fell towards her. She ran out of the house, but did not see defendant or Leavy. She could not remember hearing any other shots after Simmons was shot when he opened the door. She thought she heard three or four shots. Simmons did not have a gun at the apartment.

On cross-examination, Williams said that Simmons was in the apartment when Walker came in. After Walker and Simmons argued, Walker went out the living room door. After Simmons opened the door, Williams heard shots, but she did not see Simmons go out. When Simmons came back in after being shot, there was no one with him. While he was living with Williams, she never saw a pistol or a sawed-off shotgun in the house. She knew Simmons was on parole. She did not recall telling the police that it would have been bad for Simmons to have a gun.

John M. Novay of the Winnebago County sheriff's police testified that he investigated the Simmons shooting. On August 11, 1991, he interviewed defendant after advising him of his rights. Defendant related that Simmons had come to his house at about 3 or 4 p.m. with property belonging to his girlfriend, Janice Walker. Defendant said Simmons seemed to be upset about something and "had an attitude." Simmons told Walker not to come back to his apartment. Walker wanted to go over to the apartment to get half the grocery money and rent money. Defendant agreed to drive her over to Simmons' apartment. When they arrived, Walker got out of the car, walked over to the apartment, and, after a period of time, he heard some arguing. He got out of the car to see what was going on.

According to Novay, as defendant got to the door, Walker came out of the apartment, and defendant was then confronted by Simmons, who had a pistol. There was an altercation, and defendant was able to get the gun from Simmons. When Simmons was approximately 8 to 10 feet away from defendant, defendant shot Simmons as he

faced him and shot him again as he turned away. Defendant then "just started pulling the trigger, and it was just clicking." He did not know if the pistol was malfunctioning or was out of ammunition. At this point, defendant said he saw what he described as a shotgun poking out of the door of Simmons' home. Defendant could not identify who had the shotgun.

When Novay asked defendant if the shotgun was pointed at him, defendant said no. He thought he was about to get shot. He turned and walked to his car, and, as he was about to get to his vehicle, he heard a shotgun blast or he heard a loud gun go off. He turned around and noticed a male whom he could not identify standing at the south corner of Simmons' house. Defendant dropped the pistol and ran the rest of the way to the car and left the scene. Defendant said there were several occupants in the house, and he saw the man with the shotgun come out of the back door and come around the corner to the front of the building where the initial shooting took place. Defendant did not hear any blasts until he got near the street. According to Novay, it was after the shooting of Simmons that defendant first saw what he thought was the shotgun at the door. Defendant agreed to give a statement and signed it after it was typewritten. He wanted the matter cleared up and turned himself in.

On cross-examination, Novay said defendant turned himself in when he found out the police were looking for him and that the Black Disciples gang was after him.

The written statement was read into the record. Substantially similar in content to the officer's testimony, the statement related that defendant parked his car on Cameron Avenue and he could see the door of Simmons' apartment from the car. Walker went over to the apartment and went in. Defendant could hear arguing. He got out of the car and started walking toward the apartment. As he got to the window of the apartment, Walker ran out. Simmons came out with a pistol in his right hand. It was a long-barreled black revolver. The report stated:

"We got into it, and I got the gun away from him. He turned towards somebody and said, 'See what I mean.' I shot him, and I kept pulling the trigger. I know that he was turned away from me when I was still shooting. I know that it went off twice and was just clicking when I pulled it after that. I don't know if it was out of bullets or stopped working. He had turned to run back into the apartment. I am guessing I was about eight or ten feet away when I shot him.

I saw a shotgun at the screen door. I didn't see who was holding it. The screen was open a little, and Lamar went in. I turned away

and started walking away. I had the gun in my right hand. I was wearing regular jeans and a white shirt with blue stripes.

When I got out of the car by the street, I heard two shots. A man was standing at the corner of the apartment by Lamar's. I dropped the gun I had and ran for the car. I drove to my house on Avon. I waited for Janice. When she got there, we went and stayed at the Flying Saucer Motel on 11th Street. My son, James Bruce Agee, took us over there. I didn't tell him anything. I was the one that asked him to take us over there."

The report further stated, "When I shot the man, I could not tell you if I was trying to kill him or not. I just don't remember. It happened too fast."

Kenneth Lee Hodges testified that he was 34 years old and lived on the third floor at 311 Cameron Street in Rockford on August 10, 1991. He was sitting in his dining room when he heard some noise from the window. He went to the window and saw Simmons and defendant arguing below. Hodges could see Simmons very well because it was sunny out. He had seen Simmons before but did not know defendant. As he went to the window, he saw defendant pull up a gun, aim it at Simmons, and shoot twice. One shot was high and one was low. Simmons did not have a gun. Defendant was about 10 feet from Simmons, who fell back and went into the house. Blood from Simmons' shoulder splattered onto the wall. About 15 or 20 seconds after Simmons went into the house, Hodges saw a male come around to the south side of the building; he pulled up a sawed-off shotgun and was shooting at defendant. He did not come out from the same door into which Simmons had fallen. The man shot twice at defendant. Defendant clicked his gun but it was empty; he walked slowly toward the parking lot north of the building. Hodges then saw another man leaving with a shotgun, and he was also heading in the same direction as defendant about 20 feet away. Hodges heard no further shots.

On cross-examination, Hodges said that as he looked out his window defendant was already pulling up his gun. Defendant fired the two shots in succession. Defendant's gun looked like a .38 caliber. Hughes did not see a woman before or after the shooting. The police arrived about 10 minutes later.

Other police testimony showed that a piece of plastic typically used as shotgun wadding was found about 35 feet from the door where Simmons was shot. A 9 mm casing typically associated with a semiautomatic handgun was found about 11 feet from the door. No shotguns or handguns were found at the scene. A stipulation was entered stating that the slug recovered from the body of Simmons during surgery was not from a .22 caliber bullet.

Janice Walker testified for the defense. She had known defendant for six years. She had been living with DeAngela Williams and her children and Simmons at 258 Chestnut Court in August 1991. Walker saw guns in the apartment on "quite a few" occasions, but did not know the difference between a pistol and a rifle. She knew what a shotgun was and had seen one in the house before. On August 10 she saw Simmons at defendant's house when he came to ask her for the key to the apartment on Chestnut. When she asked him what was wrong, he did not say. When defendant asked if Walker had paid her rent, he did not reply but said defendant did not have to talk to him like that.

A few minutes after Simmons left, defendant and Walker went to Simmons' apartment. Defendant did not have a gun. When they arrived, Walker got out of the car and walked into the house. Simmons and Leavy were standing outside. Simmons followed Walker into the house, where Walker asked Williams what was wrong. Williams said that Simmons wanted Walker out of the apartment because food was taken out of the house. Walker said she bought the food and had the right to take it. Walker went upstairs to get some clothes. Simmons said he would "f___ [her] up." Walker replied that she was not worried about Simmons "messing with" her. As she left, Walker said she would be back. Simmons said she would not get in. He was right behind her. Walker walked toward defendant's car. Suddenly, she turned and saw defendant and Simmons struggling with a pistol. She did not see Leavy. She turned around and heard a shot. When she turned again, she saw blood on the wall and Simmons going back into the house. She saw no one else before she went toward Concord. As she was headed toward Concord, she heard a loud noise; she turned and saw a long black gun out of the screen door where she had been. She did not see who was holding the long gun.

On cross-examination, Walker said that, when she first walked out of the house, defendant was standing by a tree. When she later turned around, she saw defendant and Simmons struggling. Defendant did not have any blood on his clothes after the shooting. She met defendant later that night at the Flying Saucer Motel, but claimed they did not discuss the incident. The first time she saw the long black gun sticking out of the screen door was the second time she turned around after the shooting. She heard defendant shoot twice. She could not say whether the long gun was the same one she had seen at Simmons' apartment previously. She kept walking and did not go back to defendant's car because of the shooting.

Mickella Campbell testified that she was 12 years old and lived at

306 Cameron on August 10. She was at her cousin's house at 250 Chestnut Court and was walking with her cousin to a friend's house when they heard something go "boom." They turned around and saw a black male with a white shirt holding a long gun and heard a lady scream. The man was standing in front of 258 Chestnut. She did not see anyone else with a gun. Campbell felt her thigh hurting; her cousin's hand was bleeding. Her cousin's house was next door to 258 Chestnut Court. They ran into a building after being shot.

Detective Rocco Wagner testified that he interviewed Simmons on August 15 at Rockford Memorial Hospital. He asked Simmons if the reason his fingerprints were on the gun was because he and defendant had struggled over it; Simmons responded that that must have been the reason. Wagner acknowledged that Simmons was medicated at the time he interviewed him and could not sign a statement because he was groggy. Simmons did go through a complete version of what happened, however.

Outside the jury's presence, an offer of proof was made in which Wagner said he asked Simmons if he was a Disciple and whether the shooting was gang related. Wagner testified that Simmons stated he was a Disciple.

John M. Novay was recalled as a defense witness. He stated that when he went to the hospital he asked Williams why someone would be deceitful about weapons in Simmons' case. She said he was on parole and could get in trouble for it.

Over the objection of the State, the defense sought to present proof regarding the specific charge against Darnell Leavy by calling an assistant clerk of the court to read the charge pending against Leavy. The defense would show that Leavy was charged by information with aggravated battery in shooting Mickella Campbell and Veda Neal with a shotgun while shooting at another on August 10. Defendant claimed this evidence was relevant because Simmons would have known about the pending charge and it arose out of the same incident as the Simmons shooting. Defendant conceded that Simmons admitted in cross-examination that he was aware that there was a charge pending against Leavy. The court observed that the pending charge was not evidence to prove that the person charged committed it and that Simmons admitted that he knew Leavy was charged with an offense but Simmons denied that he was lying. The court concluded that evidence of the actual charge was irrelevant and sustained the State's objection. An offer of proof was made, and the charge was read into the record outside the hearing of the jury.

Defendant argued to the jury that he shot Simmons in self-defense because he thought he was going to be shot. Among other

things, he theorized that it was Leavy who had the shotgun that defendant and his girlfriend saw poking out of the door and that Leavy was prevented from shooting defendant because Simmons turned to go toward the door knowing there was a shotgunner there. After the 20-second pause following the shooting of Simmons, Leavy presumably came around the house to shoot at defendant. Defense counsel also challenged Simmons' credibility, pointing out that Leavy was Simmons' cousin and close friend and that Simmons knew that Leavy was charged with aggravated battery for shooting at the two little girls; he further argued that this was why Simmons was insistent that Leavy was not present. After closing arguments, the jury found defendant guilty of aggravated battery with a firearm, but not guilty of attempted murder.

Defendant contends that his right to challenge the bias of Simmons, the complaining witness, was improperly denied because the trial court refused (1) to permit defendant to inquire into the witness' gang membership or (2) to present evidence (of the charge) establishing that the witness was lying to protect his cousin and fellow gang member who had been charged with aggravated battery with a firearm arising out of the same incident. Defendant premises his arguments on the defendant's constitutionally protected right to cross-examine a witness as to his biases, prejudices, or ulterior motives (citing *People v. Gonzalez* (1984), 104 Ill. 2d 332, 337), or, alternatively, on his right to present a defense based on competent and relevant evidence (citing *People v. Manion* (1977), 67 Ill. 2d 564, 576; see *Taylor v. Illinois* (1988), 484 U.S. 400, 408-10, 98 L. Ed. 2d 798, 810-11, 108 S. Ct. 646, 652-53).

Defendant correctly states that a defendant has the right to question a prosecution witness regarding any matter which goes to explain, modify, or discredit the witness' testimony (citing *People v. Barr* (1972), 51 Ill. 2d 50, 51), but he appears to suggest that the trial court has little or no discretion to limit a defendant's right to show the bias or ulterior motive of a witness (citing *People v. Triplett* (1985), 108 Ill. 2d 463, 474-75). However, in attempting to show that the trial court committed reversible error, defendant then applies the three-factor test for a harmless error analysis found in *People v. Wilkerson*; defendant focuses his analysis almost entirely on the court's refusal to allow the jury to hear the aggravated battery charge against the complaining witness' cousin, Darnell Leavy, and then throws in the issue of gang membership for good measure. See *People v. Wilkerson* (1981), 87 Ill. 2d 151, 157 (to determine whether there is harmless error beyond a reasonable doubt, factors for analysis include (1) focusing on the error to determine whether it might have

contributed to the conviction; (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction; and (3) whether the impeaching evidence is cumulative or merely duplicates properly admitted evidence).

A defendant's sixth amendment right to cross-examine a witness against him to show bias or motive to testify falsely does not prevent the trial judge from imposing any limits on defense counsel's inquiry into the potential bias of the prosecution's witness. (*People v. Harris* (1988), 123 Ill. 2d 113, 144, citing *Delaware v. Van Arsdall* (1986), 475 U.S. 673, 678, 89 L. Ed. 2d 674, 683, 106 S. Ct. 1431, 1435.) We fully recognize the importance of safeguarding a defendant's right to confront and cross-examine a witness against him. However, "[i]t is well established that a trial judge retains wide latitude insofar as the confrontation clause is concerned to impose reasonable limits on such cross-examination based on concerns about harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or of little relevance." (*Harris*, 123 Ill. 2d at 144, relying in part on *Van Arsdall*, 475 U.S. at 678, 89 L. Ed. 2d at 683, 106 S. Ct. at 1435; see *Triplett*, 108 Ill. 2d at 475-76 (court may preclude repetitive or unduly harassing evidence; evidence must give rise to inference that witness has something to gain or lose by his testimony, and evidence must not be remote or uncertain).) The " 'Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (Emphasis in original.) *Harris*, 123 Ill. 2d at 144-45, quoting *Delaware v. Fensterer* (1985), 474 U.S. 15, 20, 88 L. Ed. 2d 15, 19, 106 S. Ct. 292, 295.

The question in this type of case is whether defendant's inability to make the inquiry created a substantial danger of prejudice by depriving him of the ability to test the truth of the witness' direct testimony; in answering this question, the court must look to the record as a whole and the alternative means open to the defendant to impeach the witness. (*Harris*, 123 Ill. 2d at 145.) If that review shows that the jury has been made aware of adequate factors concerning relevant areas of impeachment of a witness, no constitutional question arises merely because defendant has been prohibited on cross-examination from pursuing other areas of inquiry. (*Harris*, 123 Ill. 2d at 145.) Thus, in determining whether defendant's right of confrontation has been violated, a reviewing court looks not only to what defendant was prohibited from doing, but also to what he has been allowed to do; and where the jury has been made aware of adequate factors regarding the credibility of the prosecution witness, a reviewing court may conclude that there is no constitutional error or

manifest prejudice to defendant. See *People v. Hines* (1981), 94 Ill. App. 3d 1041, 1048-49.

With these principles in mind, we now address whether, with respect to defendant's right to challenge the credibility of the complaining witness, it was prejudicial or reversible error for the trial court to limit the testimony concerning the witness' gang membership and to deny the reading of the charge against his cousin. Evidence of gang membership is highly prejudicial and inflammatory but will not necessarily be excluded if it is otherwise relevant and admissible. (*People v. Gonzalez* (1991), 142 Ill. 2d 481, 489; see *People v. Easley* (1992), 148 Ill. 2d 281, 330.) It is the function of the trial court to weigh the probative value against the prejudicial effect of such evidence in determining whether it should be admitted. (*Gonzalez*, 142 Ill. 2d at 489; *People v. Maldonado* (1992), 240 Ill. App. 3d 470, 475; see also *People v. Nichols* (1992), 235 Ill. App. 3d 499 (evidence of gang membership or activity must be related to the crime charged to be admissible).) A trial court may reject offered evidence on the ground of irrelevance if it has little probative value due to its remoteness, speculativeness, uncertainty, or its possibly unfair prejudicial nature. *People v. Enis* (1990), 139 Ill. 2d 264, 281-82.

While a witness' gang activity may be relevant to show bias against the defendant because the partiality of a witness is always relevant (*Gonzalez*, 104 Ill. 2d at 337-38), in this case, we believe the trial court properly excluded this avenue of inquiry in weighing its probative value (here, its marginal relevance) against the potential for prejudice and confusion of the issues where defendant had other alternatives which he used to discredit Simmons' testimony. Notwithstanding defendant's characterization of the evidence presented, we have found no competent evidence in the record to show that the shooting of Simmons was in any way induced by prior gang activity. Even though defendant speculated that Simmons' cousin Leavy held the shotgun thought to be poking out of the door, there is no competent proof that Leavy was in fact the shotgunner behind the door.

Even the testimony attributable to defendant and his girlfriend does not place the shotgunner there until after Simmons was shot. The fact that Leavy may conceivably have used the shotgun in retaliation later would not support defendant's theory that defendant initially shot Simmons in self-defense. The relationship between gang membership and the shooting of Simmons is speculative at best.

The other possible relevance of Simmons' gang membership would be to show his bias or motive to lie to protect his cousin from possible prosecution. However, defendant had ample alternative

means to show Simmons' bias. From the evidence presented, the jury was aware that Leavy was Simmons' cousin and good friend and that Simmons knew his cousin had been charged with an offense involving the possession of a shotgun on the evening in question and that Simmons' testimony could be used against his cousin. Simmons acknowledged this in his cross-examination. The jury was also aware that Simmons had been on parole at the time of the shooting, that he could have been in trouble for having a weapon in his possession, and that he had committed prior offenses. Novay was permitted to testify that defendant turned himself in because of his fear of the Black Disciples. Finally, defense counsel vigorously argued to the jury that Simmons was not credible and that his testimony was colored by his knowledge that Leavy was charged with aggravated battery for shooting at the two little girls. Pursuing this line of inquiry would serve not only to inflame and confuse the jury, but would also have been speculative, of marginal relevance, and ultimately cumulative on the issue of Simmons' bias.

For similar reasons, we believe the trial court did not err in denying his request to read the actual charge against Leavy to the jury. First, the trial court correctly observed that the charge against Leavy was itself not competent evidence that he committed the offense. Leavy did not testify at this trial. Again, the only possible legitimate use of this evidence would have been to amplify an issue already known to the jury, that Simmons' testimony might be colored to protect his cousin who had been charged with a gun-related offense possibly stemming from, but not proved to be the cause of, Simmons' shooting. As we have already shown, Simmons' potential bias was already well established by the other evidence, and the reading of the specific charge would have had little further probative value.

The trial court was correct in concluding that this evidence was irrelevant under the circumstances. The test of admissibility of evidence is whether it tends to prove the particular offense charged, and whether the evidence will be admitted or excluded depends on whether it tends to make the question of guilt more or less probable, that is, whether it is relevant. (*People v. Enis*, 139 Ill. 2d at 281.) A trial court may reject offered evidence on the basis of irrelevancy if it has little probative value due to its remoteness, uncertainty, or its possibly unfair prejudicial nature. *Enis*, 139 Ill. 2d at 281.

The reading of the allegations in the charge against Leavy had no probative value in showing that Leavy was actually the shotgunner who was present at the shooting; it would have fostered what amounted to an unlimited fishing expedition for other unsubstantiated impeaching facts (see *People v. Rivera* (1986), 145 Ill. App. 3d

609, 620) and would have added nothing further in showing that Simmons was biased. The fact that the witness' cousin was charged was already known to the jury, and the court had the discretion to exclude the evidence for remoteness or uncertainty. (*Triplett*, 108 Ill. 2d at 475-76.) In addition, the court had the discretion to prevent the proliferation of essentially collateral issues which would tend to divert the jury's attention from the central issue in the trial. See *People v. Jackson* (1992), 237 Ill. App. 3d 712, 719-20.

After examining the record as a whole, we conclude that the trial court did not abuse its discretion in limiting defendant's evidence of bias under the facts presented. (*Enis*, 139 Ill. 2d at 281.) This is not a case where the trial court erroneously prohibited *all* inquiry by defendant into the possible bias of the prosecution's witness. (See, *e.g.*, *Van Arsdall*, 475 U.S. at 679, 89 L. Ed. 2d at 683, 106 S. Ct. at 1435 (prohibiting all of defendant's inquiry into bias of prosecution witness was constitutional violation).) We find in the record neither constitutional error nor manifest prejudice to defendant resulting from the court's rulings. Accordingly, we need not consider whether harmless error occurred under any of the *Wilkerson* factors (notwithstanding our conclusion that the evidence defendant sought to introduce would have been essentially cumulative).

The judgment of the circuit court is affirmed.

Affirmed.

COLWELL and PECCARELLI, JJ., concur.