THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
EDDIE RUFUS, Defendant-Appellant.

First District (2nd Division)    No. 79-1927

Opinion filed February 16, 1982.

James J. Doherty, Public Defender, of Chicago (Timothy P. O'Neill, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Ruth Stern Geis, and James B. Koch, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DOWNING delivered the opinion of the court:

Eddie Rufus and four others were charged with the murder of Michael Simkins. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1.) Defendant Rufus was tried alone before a jury and found guilty. He was sentenced to a term of 40 years.

Michael Simkins was shot to death on the sidewalk of North Mohawk Street in the city of Chicago, near the Cabrini-Green housing project. The shooting occurred on April 29, 1979, at approximately 5:15 p.m. Two eyewitnesses testified for the State. Owen Terry was sitting in a parked car when he heard a gunshot. He testified that he turned and saw two men standing over a man lying on the ground. One man had a gun which he pointed at the victim's head, from a distance of about 1½ feet, and fired another shot. The two men then fled.

Grover Evans, 18 years old, was acquainted with the victim. Two nights before the shooting, he, Simkins, and Makia Davis met with defendant Rufus and four of his companions. Defendant asked Evans for the money obtained from a cab driver holdup, and then stated that he had a contract out on the lives of Evans, Simkins, and Davis.

The day of the incident, Evans, Davis, and Simkins went to Farmer Brown, a chicken and ribs restaurant. There, they encountered defendant and two companions. Defendant told Michael Simkins that "he was going to be fried like hot links." Subsequently, Evans and Simkins were standing on Mohawk Street eating their chicken when three men with handguns, identified as defendant, "Bear," and Rick Stone, appeared and fired at Evans and Simkins, hitting Simkins. He fell, and defendant approached,

stood directly over Simkins, and fired a shot into his head from a distance of 1½ feet.

Two days after the shooting, defendant surrendered to the police. A lineup was conducted for Owen Terry and he identified defendant. At a hearing on defendant's motion to suppress the out-of-court identification, Owen Terry and Investigator Lawrence Flood testified, after which the trial court denied the motion to suppress.

The other major trial witnesses for the State were Officer Masalski, who arrived on the scene soon after the incident, Bahaadar Mujaahid, a friend of defendant, and Investigator Flood, who testified to statements he had taken. The testimony of Mujaahid will be recounted in detail in the discussion of the issues.

I

We first consider defendant's claim that the trial court erroneously denied his motion to suppress the out-of-court identification made by Owen Terry. We disagree. Terry, an eyewitness to the shooting, identified defendant in a lineup. Defendant's motion to suppress the out-of-court identification was denied after a hearing, and Terry subsequently testified to that identification. Terry was unable to make an in-court identification of defendant.

Two days after the incident, defendant surrendered to the police. A lineup was then conducted for Terry. Terry previously described the suspect to the police as a black male wearing a grey cap, green jacket, and light blue pants. Defendant was wearing similar clothes when he surrendered and was placed in the lineup. Defendant's cap was placed, in turn, on all six men in the lineup.

Terry stated that he never saw a front view of the suspect's face during the shooting, and during the lineup could not identify defendant by his face. The identification of defendant in the lineup was based primarily on defendant's clothes, according to Terry.

Defendant claims that the lineup identification should have been suppressed as the fruit of a suggestive lineup. Defendant cites *Israel v. Odom* (7th Cir. 1975), 521 F.2d 1370, which we read to support the proposition that the instant lineup was not unconstitutionally suggestive. There, the description of the defendant included eyeglasses. At the lineup, defendant was the only one of five men wearing glasses. Further, Odom was 5′5½″ tall, while three of the other four men in the lineup were over 6′ tall. The court of appeals held there were sufficient indicia of reliability present to permit the admission of the lineup identification.

■■ A lineup identification will be admitted at trial even if the lineup procedure was suggestive, so long as there are sufficient indicia of reliability surrounding the identification. Several important factors to be

considered are set out in *Neil v. Biggers* (1972), 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 411-12, 93 S. Ct. 375, 382-83. Upon our consideration of these factors and the totality of the circumstances, we find sufficient indicia of reliability in the instant identification to permit its admission.

Alternatively, defendant contends that any lineup identification based primarily on the clothing of the suspect is *per se* invalid and must be suppressed. Terry was vigorously cross-examined concerning the lineup, and the jury was fully aware of the circumstances surrounding it. That the identification was based primarily on clothing goes only to the weight to be given the identification by the jury, not its admissibility. The cases cited by defendant support this conclusion. (See *People v. Versher* (1977), 52 Ill. App. 3d 148, 150, 367 N.E.2d 311; *People v. Reed* (1968), 103 Ill. App. 2d 342, 346-49, 243 N.E.2d 628.) We find this contention without merit. The trial court properly denied the motion to suppress.

## II

Defendant contends that the trial court's order clearing the courtroom of certain spectators during the testimony of Owen Terry deprived him of his right to a public trial. Prior to Owen Terry's testimony on the motion to suppress, the trial court held an *in camera* hearing, on the State's request, to close the courtroom during Terry's testimony. The defense objected. The trial court ordered the courtroom closed. Subsequently, during Terry's testimony in the trial, the courtroom was also closed based on the evidence adduced at the earlier *in camera* hearing.

At the *in camera* hearing, Owen Terry testified that he was afraid to testify, and that certain incidents occurred which he perceived as threats. He had sent two of his children out of town. He received a phone call in which a male voice said, "Did you get the message?" Shots were fired at his front porch and his automobile was vandalized. The trial court believed that Terry was afraid and thus issued the closure order. The order limited access to the courtroom during Terry's testimony to the parties, their attorneys, other defendants on the trial court's call and their attorneys, the press, and court personnel. Subsequently, a group of high school students on a field trip was allowed to remain in the courtroom during Terry's testimony.

Defendant claims that his right to a public trial under the sixth and fourteenth amendments was violated, citing the recent cases of *Richmond Newspapers, Inc. v. Virginia* (1980), 448 U.S. 555, 65 L. Ed. 2d 973, 100 S. Ct. 2814, and *Gannett Co. v. DePasquale* (1979), 443 U.S. 368, 61 L. Ed. 2d 608, 99 S. Ct. 2898. Those cases, however, deal with the right of the press and the public to attend a trial when all parties and the trial court agree to closure.

We consider the relevant case law to be that which deals with

situations where the courtroom was closed over defendant's objection, as in the instant case. *People v. Latimore* (1975), 33 Ill. App. 3d 812, 342 N.E.2d 209, *appeal denied* (1976), 62 Ill. 2d 591, and *United States ex rel. Latimore v. Sielaff* (7th Cir. 1977), 561 F.2d 691, *cert. denied* (1978), 434 U.S. 1076, 55 L. Ed. 2d 782, 98 S. Ct. 1266, deal with the same trial. In *Latimore*, the courtroom was closed during the testimony of the victim in a rape trial, but remained open during the testimony of the other eight witnesses. The press was allowed to remain, although it is unclear whether any reporters were present. Both the appellate court and the court of appeals approved of this procedure.

The court of appeals stated that the right of the defendant to have ordinary spectators present at trial was not absolute, but must be balanced against other interests which justify excluding them. We agree. In *Latimore*, the other interest was the concern for the rape victim. The court noted that society has an interest in lessening the ordeal of the victim, thereby encouraging her to report the crime. The court also noted that the closure order was drawn as narrowly as possible.

■■ We find the instant case very analogous to *Latimore*. Here, the interest balanced against defendant's right to a fully open courtroom is the safety of the witness. Society has an interest in encouraging those who witness murder to testify. The closure order in the instant case only applied during the testimony of Owen Terry, and the press and various other persons were still permitted in the courtroom. We fail to see how the defendant was prejudiced. We hold that the closure order of the trial court was proper.

## III

### A.

Defendant argues that the trial court placed an improper limitation on defense counsel's cross-examination of Grover Evans, who testified as a prosecution eyewitness to the shooting of Michael Simkins. He positively identified defendant as one of the people who shot at Simkins initially, and as the person who fired the second shot directly at Simkins. Evans also supplied a motive for the shooting. In sum, Evans was a critical witness for the State.

In turn, Evans was subject to a great number of impeachment questions on cross-examination which took two principal forms. First, Evans was examined about a prior tape-recorded inconsistent statement that was given to defense counsel. Evans had earlier stated that he didn't see who fired the shots, as he was too drunk at the time. There was extensive cross-examination concerning this prior statement.

Second, Grover Evans was impeached by reference to various

aspects of his criminal background. Reference was made to a prior conviction for criminal trespass to a vehicle and to his currently being on probation. Evans was, at the time of his testimony, charged by information with armed robbery, aggravated battery, and home invasion, and resided in Cook County jail. Defense counsel was permitted to bring before the jury that Evans had felony charges pending and that he had been recently moved to the witness quarters of the county jail. Counsel also asked a number of questions concerning whether any leniency had been promised in return for Evans' testimony.

The trial court, however, refused to allow disclosure to the jury of the specific nature of the pending charges (*i.e.*, armed robbery). Defendant claims that this constitutes reversible error. He claims that he was entitled to show the bias of the witness by showing that the witness was currently charged with a crime by the same authority that was prosecuting the instant case. Defendant argues that, to fully assess the witness' bias, the jury should be presented with the exact nature of the charges.

### B.

A full discussion of this issue involves two separate principles of law. First, the confrontation clause of the sixth amendment to the United States Constitution grants the accused the right "to be confronted with the witnesses against him." (U.S. Const., amend. VI.) This provision is applied to the States through the fourteenth amendment. (*Pointer v. Texas* (1965), 380 U.S. 400, 406, 13 L. Ed. 2d 923, 927, 85 S. Ct. 1065, 1069.) Impeachment through showing bias comes within the ambit of the confrontation clause. *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105.

In *Davis*, the court held that petitioner's rights under the confrontation clause were violated by the trial court's limitation of his cross-examination of a prosecution witness. The witness, the only eyewitness to any part of the crime, was currently on juvenile probation. Defense counsel wanted to present that fact to the jury in order to establish the bias of the witness, but was not permitted to do so. The Supreme Court reversed the conviction, stating:

> "While counsel was permitted to ask Green *whether* he was biased, counsel was unable to make a record from which to argue *why* Green might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial. * * *. [D]efense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Emphasis in original.) *Davis v. Alaska* (1974), 415 U.S. 308, 318, 39 L. Ed. 2d 347, 355, 94 S. Ct. 1105, 1111.

■■ We find no violation of defendant's right of confrontation in the instant case. Defense counsel was allowed substantial leeway in cross-examining Grover Evans, including cross-examination about the pending charges. Counsel was allowed to demonstrate that Evans had a pending felony information and that he currently was incarcerated in the county jail. Further, Evans admitted that after he agreed to testify against defendant, he was transferred from the general area of the jail to the witness quarters. The only area defense counsel was prohibited from developing was the specific nature of the charges pending against the witness. Under these circumstances, the constitutional mandate of confrontation was met. Compare *People v. Wilkerson* (1981), 87 Ill. 2d 151, 156 (right of confrontation violated).

## C.

Secondly, it has long been held that cross-examination is permitted to show bias of a witness. "[T]he *pendency of any indictment* against the witness indicates indirectly a * * * possibility of his currying favor by testifying for the state." (Emphasis in original.) 3A Wigmore, Evidence §967 (Chadbourn rev. 1970); see E. Cleary and M. Graham, Handbook of Illinois Evidence §607.7 (3d ed. 1979).

A leading case in this State is *People v. Mason* (1963), 28 Ill. 2d 396, 192 N.E.2d 835. In *Mason*, the court held that the widest latitude should generally be allowed a defendant in cross-examination for the purpose of establishing bias. A criminal defendant should be allowed to show that a witness has been charged with a crime "where it would reasonably tend to show that his testimony might be influenced by interest, bias or a motive to testify falsely." 28 Ill. 2d 396, 401; see generally E. Cleary and M. Graham, Handbook of Illinois Evidence §607.7 (3d ed. 1979).

Defendant's rights secured by the confrontation clause and the common law right to cross-examine regarding bias must be considered independently. The discretionary authority of the trial court to restrict the scope of cross-examination comes into play only after there has been permitted, as a matter of right, sufficient cross-examination to satisfy the confrontation clause. (*United States v. Vasilios* (5th Cir. 1979), 598 F.2d 387, 389, *cert. denied* (1979), 444 U.S. 967, 62 L. Ed. 2d 380, 100 S. Ct. 456.) To determine whether a limitation of cross-examination violates defendant's right of confrontation, we look:

"* * * not to what defendant has been prohibited from doing but to what he has been allowed to do. * * * [I]f it appears from the entire record that the jury has been made aware of adequate factors concerning relevant areas of impeachment of a witness, no constitutional question arises merely because defendant has been prohibited on cross-examination from pursuing other areas of

inquiry." (*People v. Hines* (1981), 94 Ill. App. 3d 1041, 1048, 419 N.E.2d 420.)

See also *People v. Baugh* (1981), 96 Ill. App. 3d 946, 951, 422 N.E.2d 166.

■■ Although we find no constitutional violation, we do find that the trial court's limitation of defense counsel's cross-examination of Grover Evans was improper under the law of evidence. The trial court's refusal to allow the specific nature of the pending charges constituted an abuse of discretion in the instant case. We perceive no good reason to keep this information from the jury, and a good reason to bring it to their attention. The jury is entitled to know the nature of the pending charge in order that it will have before it complete information so as to be better able to resolve the bias question. The seriousness of the charge is a factor the jury is entitled to weigh when assessing the bias of the witness.

We next consider whether, under the record of this case, the record is so prejudicial so as to require reversal. A reviewing court will not find reversible error where cross-examination was unduly restricted unless "there was a clear abuse of * * * discretion, resulting in manifest prejudice." *People v. Hubbard* (1973), 55 Ill. 2d 142, 151, 302 N.E.2d 609; see also *People v. Eddington* (1979), 77 Ill. 2d 41, 47, 394 N.E.2d 609; *People v. Mason* (1963), 28 Ill. 2d 396, 403; *People v. Patterson* (1980), 88 Ill. App. 3d 168, 175, 410 N.E.2d 396.

■■ While the trial court abused its discretion in limiting cross-examination, we cannot say that defendant was manifestly prejudiced by this error. In view of the substantial cross-examination of Grover Evans and argument to the jury by defense counsel, the credibility of the witness was clearly brought to the attention of the jury. We do not believe that the additional cross-examination would have affected the jury's determination of the witness' credibility. Accordingly, we find no prejudicial error notwithstanding the limitation of cross-examination.

## IV

We next consider whether the examination of witness Bahaadar Mujaahid by the State was improper. The State called Mujaahid during its case in chief for one reason: to testify about a statement made by defendant in which he admitted the shooting. A police report quoted Mujaahid as making the following statement to police, relating a conversation he had with defendant:

> "He [defendant] and Bear were walking down a side street and noted the subjects continue to follow them. At this point, Rufus said that he, quote, iced, unquote one of the subjects, and Bahaador [*sic*] asked why he had shot the subject. Rufus stated that his weapon had been cocked and everything happened very quickly."

Defendant's statement to Mujaahid purportedly occurred on April 29, after the shooting.

Mujaahid, however, was not a cooperative witness at trial. Initially, Mujaahid could only remember that defendant had said to him on April 29 that defendant was afraid for his life and wanted to "talk to the police and surrender hisself [sic]." The prosecution's request that Mujaahid be declared a court's witness was denied.

Several more questions were asked of Mujaahid which implied that he was not testifying to everything he knew. A representative colloquy follows:

> "MISS PROPES [prosecutor]: Mr. Mujaahid, did you ever tell Investigator Flood about a conversation you had with Eddie Rufus on the night of April 29, 1979?
>
> MR. MUJAAHID: I think I told you the man told me some people were trying to kill him. What I told—
>
> Q. Did you ever tell Investigator Flood that Eddie Rufus told you anything else besides that someone was trying to kill him?
>
> A. Your Honor, may I address the Court, sir?
>
> THE COURT: Do you understand the question?
>
> MR. MUJAAHID: No, sir."

The court thereupon denied another request by the prosecution to declare Mujaahid a court's witness.

Subsequently, the court appointed attorney George Howard to represent the witness and to advise him of his obligation to testify truthfully and of the penalties for failure to do so. Upon resuming his direct testimony, Mujaahid's memory improved somewhat. He now recalled that defendant told him the following: Defendant was at Farmer Brown when three members of the El Rukn street gang appeared and threatened him. He left, went down Mohawk Street and was followed by the three. Then, "the guy got shot." According to Mujaahid, defendant never told him who shot the victim, or who defendant was with at Farmer Brown.

The jury was excused and at the request of the State, a *voir dire* was conducted of the witness. He denied making the statements attributed to him in the police report. When the jury returned, the prosecution asked the witness if defendant told him who shot the victim, and how many times the victim was shot. These questions were repeated several times due to objections raised by defense counsel. Mujaahid eventually answered both questions, "no." Finally, the following colloquy ensued:

> "MISS PROPES: Mr. Mujaahid, when you spoke with Mr. Rufus on the 29th of April and in the ensuing days before he turned himself in to the police, did you perceive yourself as being a confidante of his?

MR. REYNOLDS [defense counsel]: I object to that.

THE COURT: The objection will be sustained.

MISS PROPES: Did you perceive—

THE COURT: The question as phrased.

MISS PROPES: Did you act as a confidante to Eddie Rufus in those days?

MR. REYNOLDS: I object to that.

THE COURT: The objection will be sustained to the question.

MISS PROPES: In those days—well, strike that. Did you advise Eddie Rufus to turn himself in to the police?

A. Yes, ma'am.

Q. Did you perceive Eddie Rufus as a friend of yours?

MR. REYNOLDS: Objection, Judge.

THE COURT: The objection will be sustained.

MISS PROPES: Now, Mr. Mujaahid, in the times since April 29, 1979, you and I have had several conversations, have we not?

A. Yes, ma'am.

Q. Have you expressed to me a reluctance to come to this court and testify?

MR. REYNOLDS: I object now.

THE COURT: Objection sustained.

MISS PROPES: Nothing further."

Defendant's motion for a mistrial was denied.

Defendant contends that the State's examination of Mujaahid consisted of impeachment of the witness on a collateral matter. The impeachment purportedly consisted of Mujaahid's prior statement to the police, which as hearsay was substantively inadmissible. Defendant claims that there was no basis for impeachment since the witness never said anything that was damaging to the State's case, but merely refused to testify to matters beneficial to the State. In support of this contention, defendant cites *People v. Grigsby* (1934), 357 Ill. 141, 191 N.E. 264; *People v. Bryant* (1981), 100 Ill. App. 3d 17, 425 N.E.2d 1325; *People v. Pastorino* (1980), 90 Ill. App. 3d 921, 414 N.E.2d 54; and *People v. Triplett* (1980), 87 Ill. App. 3d 763, 409 N.E.2d 401.

Each of the foregoing cases, although involving pertinent principles applicable to the instant issue, is distinguishable from the instant case. For example, the prior inconsistent statements were read to the jury in all four cases. In *Bryant*, we recently covered the applicable law. (See *People v. Bryant* (1981), 100 Ill. App. 3d 17, 22-26.) There is no need to repeat the same review of the law.

■■ In the instant case, the prior statement was never presented to the jury. Defendant recognizes that no verbatim reading of the prior statement occurred, but argues that the State achieved its goal of convincing

the jury that the prior statement existed without actually reading the statement. Our reading of the record convinces us that the questioning of Mujaahid by the prosecution straddled, but did not cross the boundary between the permissible and the objectionable. The out-of-court statement was not before the jury. Further, the questioning by the prosecution did not explicitly suggest the existence of a prior statement.[1] The prosecutor's conduct was not beyond reproach, but it did not rise to the level of error. Compare *People v. Giangrande* (1981), 101 Ill. App. 3d 397, 403-04, 428 N.E.2d 503.

V

Defendant objects to three remarks by the prosecutor in closing argument which he claims deprived him of a fair trial. We have reviewed each of the remarks and based on the entire record, we find no error.

VI

Defendant argues that an erroneous jury instruction was given. The trial court instructed the jury with a modified version of Illinois Pattern Jury Instructions, Criminal, No. 3.06 (1968), which stated:

"You have before you evidence that the defendant made a [statement] relating to the crime charged in the indictment.

It is for you to determine whether the defendant made the [statement], and if so, what weight should be given to the [statement]. In determining the weight to be given to a [statement], you should consider all of the circumstances under which it was made." (People's Instruction No. 9.)

IPI Criminal No. 3.06 is identical to this modified version except that "admission" replaces "statement" in the original version.

The statement referred to in the instruction is that given by defendant to Bahaadar Mujaahid. Defendant contends that the instruction is flawed in two respects: first, the statement given by defendant does not indicate when the incident occurred; and second, there is no proof that the statement was "relating to the crime charged in the indictment."

There must be sufficient evidence in the record to support the giving of a jury instruction. When an improper instruction is given, a reviewing court will not reverse unless the instruction affected the outcome of the verdict. *People v. Kurzydlo* (1974), 23 Ill. App. 3d 791, 796, 320 N.E.2d 80, *appeal denied* (1975), 58 Ill. 2d 594.

■■ Without prolonged discussion, we find sufficient evidence in the record to support the giving of People's Instruction No. 9. Compare *People v. Dixon* (1978), 58 Ill. App. 3d 557, 561-62, 374 N.E.2d 900, *appeal*

---

[1] The prosecutor did not ask questions such as, "Did defendant tell you that he shot someone?" but asked only, "Did defendant tell you who shot Simkins?"

478

*denied* (1978), 71 Ill. 2d 610, *cert. denied* (1979), 440 U.S. 973, 59 L. Ed. 2d 790, 99 S. Ct. 1538.

## VII

Lastly, defendant contends he was not proved guilty beyond a reasonable doubt. We have thoroughly reviewed the record and find overwhelming evidence of defendant's guilt. We hold that defendant was proved guilty beyond a reasonable doubt.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS, P. J., and PERLIN, J., concur.