Docket No. 87245–Agenda 2–May 2001.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MURRAY BLUE, Appellant.

Opinion filed September 27, 2001.

JUSTICE FITZGERALD delivered the opinion of the court:

Following a jury trial in the Cook County circuit court, the defendant, Murray Blue, was convicted of first degree murder for killing Louis Moret. The jury found the defendant eligible for the death penalty. See 720 ILCS 5/9–1(b)(3) (West 1998). The jury then found no mitigating circumstances sufficient to preclude the death penalty, and the trial court sentenced the defendant to death. That sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a).

We reverse the defendant’s conviction and remand for a new trial.

BACKGROUND

Around 10 a.m. on February 26, 1995, a Chicago police officer patrolling a west side neighborhood passed an Amoco gas station where a group of people had gathered. When the officer pulled into the station’s parking lot, she saw Louis Moret lying dead on his back in a pool of blood near the rear of the cashier’s booth. An autopsy revealed that Moret had been shot 14 times. Injuries to his lungs, heart, liver, spleen, kidneys, and intestines caused his death. On March 8, 1995, the defendant was arrested on an unrelated charge.
(footnote: 1) He was later indicted for the first degree murder of Moret.

At trial, Terrance Hall, an attendant at the Amoco station, testified that a two-tone gray van pulled up to the full-service pumps around 10 a.m. on the day of the shooting. While Hall filled the van with gas, a green car pulled up to the self-service pumps. A passenger, Moret, exited the car, approached the van, and spoke to the van’s driver. Hall could not hear this conversation. According to Hall, Moret then walked away from the van and stood in line at the cashier’s booth with two persons from the car. The defendant then exited the van, walked toward the cashier’s booth, and began arguing with Moret. Hall finished pumping gas for the van and returned to the booth. Inside the booth, Hall saw the defendant become angrier as the argument continued; Moret did nothing. Hall could not quite hear the entire argument from inside the booth. He did not hear any mention of drugs or gangs, but he did hear the defendant say “f– this bitch.” During the argument, Hall did not see anything in Moret’s hands nor did he see Moret reach into his jacket or make any unusual movements with his hands. Hall testified that he saw the defendant shoot Moret once. Moret then turned to run, but the defendant pursued him and shot him again. Moret fell to the ground, and the defendant kept shooting. As Hall called 911, the defendant returned to the van, which then sped away from the gas station.

Irma Pane, a cashier at a gas station across the street from the shooting, testified that she saw a green car pull into the Amoco station around 10 a.m. Moret exited the car, stopped for a moment to count money, and stood in line at the cashier’s booth. A gray van then pulled into the station, and the defendant exited the van to speak with Moret. Pane could hear this conversation because the station’s loudspeaker was on. Pane heard the defendant call Moret a “motherf––.” The defendant then pulled a gun from his side and shot Moret. Moret spun toward the car to escape, and Pane turned to call the police. When she looked back at the Amoco station, Moret was lying face down on the ground. The defendant then kicked Moret and returned to van. The van drove away from the station. Pane never saw any weapons in Moret’s hands and never saw him reach for a weapon.

Tyrus Taylor, one of Moret’s friends and the driver of the green car, testified that he pulled into the Amoco station around 9:45 a.m. on the day of the shooting with Moret, D’Shon Myrick, and Gabriel Blakemore. The four men all exited the car. Taylor prepaid for gas at the cashier’s booth and returned to the car; Moret, Myrick, and Blakemore continued to stand in line. The defendant’s gray van was already at the station. Tall Ralph and Chow Mein, two of the defendant’s friends were also standing in line at the cashier’s booth to buy cigars and soft drinks. The defendant exited the van and approached Moret. According to Taylor, he heard Moret and the defendant arguing about a recent confrontation between two high school students: “Little James,” a friend of Moret and Taylor, had slapped Tutu, a female friend of the defendant. Taylor heard the defendant say, “[F]– that nigger.” He heard Moret respond, “[F]– that bitch and f– you, too.” The defendant then pulled a gun and shot Moret. Moret began to run, but the defendant pursued him and continued to shoot. Taylor dropped to the ground, taking cover behind his car. When the shooting stopped, he saw the defendant get into the van, which sped away. Taylor stood and walked around the car to see Moret, but he did not touch him. Money from Moret’s hand was flying around the station. Taylor then gave his car keys to Blakemore, so Blakemore could leave the station to tell Moret’s family about the shooting. Taylor had not seen Moret with a gun that day, and he did not see Moret reach for anything inside his coat while at the station. Taylor conceded that the gas pump was between him and Moret during the argument, but he insisted that the pump did not obstruct his view of the shooting.

D’Shon Myrick testified that Taylor pulled into an Amoco station around 10 a.m. on the day of the shooting. Taylor, Myrick, Blakemore, and Moret all exited the car and walked to the cashier’s booth. Myrick noticed a gray van was already parked at the full-service pumps. Blakemore paid for gas, and Taylor began pumping. At the cashier’s booth, the defendant and one of his friends stood in front of Myrick and Moret. The defendant told his friends to buy cigars and got out of line to speak with Moret. According to Myrick, Moret asked the defendant why he was being phony about something regarding Tutu. Myrick could see the reflection of Moret and the defendant arguing behind him in the window of the cashier’s booth. Myrick saw the defendant wave his gun in the air and begin shooting Moret. Moret ran away from the defendant, but the defendant followed and continued to shoot. Myrick eased behind the cashier’s booth for safety and heard more shots. Once the shooting stopped, Myrick did not see the defendant or the van. He saw Moret lying on the ground with gunshot wounds; money was lying around Moret. Myrick said that before the shooting started, Moret was counting money in his hands. Myrick did not see a weapon in Moret’s hands, and he did not see Moret reach into his jacket before the shooting. Myrick flagged down a police car and ran from the station to tell Moret’s family about the shooting. Myrick encountered his friend Erwin Henry and related the events to him.

Erwin Henry testified that he heard gunshots down the street from the Amoco station. He saw Myrick crying hysterically and running down the street. According to Henry, Myrick said, “Murray shot Louis, Murray just killed Louis.” Henry drove Myrick home.

Gabriel Blakemore testified that Taylor pulled up to the self-service pumps at the Amoco station on the day of the shooting. Blakemore saw a gray van which belonged to the defendant pull up to the full-service pumps. Blakemore, Taylor, and Myrick exited the car and went to the cashier’s booth; Moret briefly went to the van and came back to the booth. The defendant exited the van, walked to the cashier’s booth, where two of his friends from the van were waiting, and instructed them to buy cigars and soft drinks. The defendant then faced Moret and began arguing about Little James and Tutu; the defendant looked upset. Blakemore did not see any weapons in Moret’s hands while they stood at the cashier’s booth, and he did not see Moret reach into his jacket. Moret had money in his hands. During the argument, the defendant pulled a gun and started shooting Moret. Blakemore and Moret ran toward their car, but the defendant shot Moret in the legs. Blakemore hid behind the car with Taylor, and when the shooting stopped, he saw Moret lying on the ground. Neither Blakemore nor Taylor touched Moret’s body. The defendant and the van were gone, and Blakemore took Taylor’s car keys and drove the car to Moret’s house.

Chicago Police Sergeant Michael Gerhardstein testified that he arrived at the scene of the shooting around 10:25 a.m. and saw Moret lying on the raised sidewalk on the side of the cashier’s booth. Two other police officers were present, including Sergeant Ronald Holiday of the Maywood police department; Holiday had collected some shell casings, $600 in cash, and a piece of jewelry. Sergeant Gerhardstein spoke with several witnesses about the gray van. He learned that the van was registered to the defendant and obtained an arrest warrant for the defendant. Sergeant Gerhardstein also spoke with Blakemore after the shooting. Blakemore said that he and Myrick tried to move Moret’s body. Sergeant Gerhardstein wrote in his investigatory notes that Blakemore, Taylor, and Myrick tried to pick up Moret before realizing that he was dead; some of Moret’s money fell out of his hands and scattered around the gas station.

The defendant testified that some friends picked him up in his van on the morning of the shooting and proceeded to the Amoco station. Two passengers, Tall Ralph and Chow Mein, exited the van to buy cigarettes, while the driver, Poo, asked the attendant for $30 worth of gas. Moret approached the van and asked Poo, “Where is that p–– a– Murray Blue at? He shot up our tip [
i.e.
, drug-selling territory].” According to the defendant, Moret was “actually really [a] drug dealer actually just somebody that’s a rival member or you can say somebody who sold drugs right down the street.” The defendant stated that he and Moret were rival drug dealers a block apart on West End Avenue. Moret and his friends called themselves the Dog Pound, a subsidiary of the Vice Lords street gang.

The defendant testified that Moret then joined his friends Myrick and Blakemore in line at the cashier’s booth. The defendant assumed Moret began talking about the shooting of his drug-selling territory with Tall Ralph and Chow Mein. The defendant exited the van and asked his two friends, “Is it all right? What’s up? Is you okay?” Moret and Blakemore, referring to the defendant, said, “There go the p–– mother f–– right there.” The defendant responded by pulling out his gun and insisting he was not involved in the shooting of Moret’s drug-selling territory. The defendant told Tall Ralph and Chow Mein to return to the van. According to the defendant, Moret, again referring to the defendant, said, “He ain’t going to do nothing, you know. We will do this guy, you know what I am saying, if you want us to.” Moret motioned with his left hand that Blakemore should move out of the way and with his right hand he was “actually reaching toward his pocket going like he going in his [jacket] pocket.” The defendant stated that he saw Moret’s right hand go into his jacket and that he believed Moret was reaching for a gun. The defendant then began to fire, and Moret ran. The defendant pursued Moret and continued to fire, thinking that he had missed Moret. After all the shots were fired, the defendant “just kind of shuffled back to the van” and drove to his girlfriend’s house in Bellwood.

On cross-examination, the defendant stated that he did not return to his own house after the shooting because he knew the police would look for him there. The defendant conceded that Moret posed no threat to him after he walked away from the van, though the defendant considered Moret’s question to be an insult. The defendant, however, thought Moret posed a threat to Tall Ralph and Chow Mein because Moret was talking to them. When the defendant asked if Tall Ralph and Chow Mein were fine, Moret did not have a gun in his hand. The defendant did not see a gun when Moret purportedly reached into his jacket. The defendant acknowledged that he never saw Moret with a gun. The defendant testified that he feared for his life for at least the first five shots he fired at Moret. The defendant’s fear dissipated once Moret was lying on the ground.

The defendant recalled Hall as a witness. Hall testified that Moret’s friends approached his body and turned him over to see if he was dead. Moret had fallen to the ground and rested on his side; Moret’s friends pushed him onto his back. Hall did not see anyone remove a weapon from Moret’s body.

Sergeant Holiday testified as a defense witness. On the day of the shooting, he was dropping off his daughter for work at the gas station where Pane worked. He noticed a commotion at the Amoco station. Holiday crossed the street and saw Moret lying face down, arms out, with money in his hands and coming from his pocket. Holiday began picking up shell casings and the money because people were “touching everything” around the crime scene. Holiday did not see anyone reach toward the body to remove anything.

The jury found the defendant guilty of first degree murder and eligible for the death penalty. After the aggravation/mitigation hearing, the jury found no mitigating factor sufficient to preclude the death penalty, and the court sentenced the defendant to death. This appeal followed.

ANALYSIS

The defendant raises numerous issues in this appeal. We focus on his third issue: whether the trial court unconstitutionally restricted defense counsel’s cross-examination of key witnesses for the State.

Before trial, the State filed a motion 
in limine
 to bar any reference to gang affiliation. The State’s motion asserted that “there is no evidence to show that this shooting was related to gang membership or any type of gang activity” and “there is no evidence to support a gang motive.” According to the State, the defendant had alternative methods for discrediting the testimony of prosecution witnesses.

At the hearing on the State’s motion, the State reiterated its contention that gang-affiliation evidence was irrelevant and potentially confusing to the jury. The defense responded that Moret and his friends were rival drug dealers and rival gang members to the defendant. The defense argued that members of Moret’s gang, the Dog Pound subsidiary of the Vice Lords street gang, had shot at the defendant’s friends and house in the days before the shooting here. Defense counsel concluded:

“Because of that, your Honor, I think here the issue is what was Mr. Blue’s reasonable apprehension at the time? The fact that these people were members of a group who had fired at him, at his home, at his friends on several occasions in the past is certainly relevant to what he is thinking at the time of this occurrence.”

The trial court provisionally granted the State’s motion “unless there is something that comes forth to show that there is some legitimate reason to let in the evidence of gang or gangs or gang activity.” The court stated, “I do not see that this has any relevance based on what has been put forth here without any specificity as to who may have been shooting at Mr. Blue or giving him a reason to want to shoot and kill this other person.”

At the close of jury selection, the defense asked the court to reconsider its ruling on the State’s motion 
in limine
. The defense asserted that its case would show the shooting involved a dispute between rival gang members over drug territory, not over an argument between high school acquaintances. Gang-affiliation evidence was relevant, the defense again argued, to show that the defendant felt threatened by Moret. Defense counsel continued, “[I]t also goes to the motive to testify. This person [the defendant] is a rival of theirs. Because he is out of the way they stand to make an awful lot of money, judge.” The State disagreed: “The fact that maybe these two groups had differing opinions or did business differently does not justify the taking of a life. All [defense counsel is] trying to do is dirty up the witness with no relevance to it. That is not what the Court should allow.”

The court observed that the defense could impeach the credibility of the State’s witnesses with their drug convictions. According to the defendant, the court then purportedly reversed its original ruling, allowing the defense to present gang-affiliation evidence during the defendant’s testimony: “You’re alleging self-defense. Then I will allow the testimony through the defendant. Based on that I rule it can properly be brought forth and he is allowed to present his defense.” Immediately before trial, the State asked the court to reconsider its new ruling. The court clarified that the new ruling did not alter the original ruling: “[M]y intent was not to allow the cross-examination of the State’s witnesses as to gang activity and gang membership. If Mr. Blue wanted to testify to that, that’s another situation. That’s another story and as I indicated I would allow that.”

The sixth amendment provides: “In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him ***.” U.S. Const., amend. VI; accord Ill. Const. 1970, art. I, §8 (“In criminal prosecutions, the accused shall have the right *** to be confronted with the witnesses against him or her”). Confrontation forces the prosecution’s witnesses to submit to cross-examination (
California v. Green
, 399 U.S. 149, 158, 26 L. Ed. 2d 489, 497, 90 S. Ct. 1930, 1935 (1970)), “beyond any doubt the greatest legal engine ever invented for the discovery of truth” (5 J. Wigmore, Evidence §1367, at 32 (Chadbourn rev. ed. 1974)). Accordingly, a criminal defendant’s constitutional right to confrontation includes the right to cross-examine. 
Douglas v. Alabama
, 380 U.S. 415, 418, 13 L. Ed. 2d 934, 937, 85 S. Ct. 1074, 1076 (1965).

“Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness’ story to test the witness’ perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, 
i.e.
, discredit, the witness. One way of discrediting the witness is to introduce evidence of prior criminal conviction of that witness. *** A more particular attack on the witness’ credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is ‘always relevant as discrediting the witness and affecting the weight of his testimony.’ [Citation.]” 
Davis v. Alaska
, 415 U.S. 308, 316, 39 L. Ed. 2d 347, 353-54, 94 S. Ct. 1105, 1110 (1974).

The scope of a defendant’s cross-examination is limited to the subject of direct examination and “[a]ny permissible matter which affects the witness’s credibility.” 
People v. Kliner
, 185 Ill. 2d 81, 130 (1998); see 1 J. Strong, McCormick on Evidence §22, at 97 (5th ed. 1999). We have noted repeatedly that the court enjoys discretion to impose reasonable limits on such cross-examination to assuage concerns about harassment, prejudice, jury confusion, witness safety, or repetitive and irrelevant questioning (see, 
e.g.
, 
People v. Frieberg
, 147 Ill. 2d 326, 357 (1992)), but this discretionary authority arises only after the court has permitted sufficient cross-examination to satisfy the confrontation clause (
People v. Averhart
, 311 Ill. App. 3d 492, 497 (1999)). Accord 
People v. Rufus
, 104 Ill. App. 3d 467, 473 (1982), citing 
United States v. Vasilios
, 598 F.2d 387, 389 (5
th Cir. 1979); see 
Heard v. United States
, 255 F. 829, 832 (8
th Cir. 1919) (“It is only after the right [of full cross-examination] has been substantially and fairly exercised that the allowance of cross-examination becomes discretionary”); see also 
Alford v. United States
, 282 U.S. 687, 694, 75 L. Ed. 624, 629, 51 S. Ct. 218, 220 (1931) (“The extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court. It may exercise a reasonable judgment in determining when the subject is exhausted”). That is, the court should afford a defendant the widest latitude to establish the witness’ bias or hostile motivation. 
People v. Kitchen
, 159 Ill. 2d 1, 37 (1994); 
People v. Barr
, 51 Ill. 2d 50, 52 (1972). A defendant states a confrontation clause violation “by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness.”
 Delaware v. Van Arsdall
, 475 U.S. 673, 680, 89 L. Ed. 2d 674, 684, 106 S. Ct. 1431, 1436 (1986).

Although a denial of the right of effective cross-examination has been labeled a “constitutional error of the first magnitude” (
Brookhart v. Janis
, 384 U.S. 1, 3, 16 L. Ed. 2d 314, 316-17, 86 S. Ct. 1245, 1246 (1966)), the Supreme Court has instructed:

“The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness’ testimony in the prosecution’s case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution’s case.” 
Van Arsdall
, 475 U.S. at 684, 89 L. Ed. 2d at 686-87, 106 S. Ct. at 1438.

Accord 
People v. Davis
, 185 Ill. 2d 317, 338 (1998); 
People v. Young
, 128 Ill. 2d 1, 43-44 (1989); see also 
People v. Wilkerson
, 87 Ill. 2d 151, 157 (1981) (confrontation clause case enumerating three approaches for measuring harmless error).

The defendant contends that the trial court erred in barring cross-examination of Taylor, Myrick, and Blakemore on their gang affiliation because such cross-examination would have revealed these witnesses’ bias against the defendant. These witnesses, argues the defendant, sought to ensure his conviction in order to eliminate a gang rival and avenge Moret’s death. See 
People v. Triplett
, 108 Ill. 2d 463, 475-76 (1985) (impeachment to show bias must create an inference that the witness has something to gain from the testimony).

We have recognized that, particularly in metropolitan areas, jurors may have negative feelings about street gangs; but “evidence of gang affiliation need not be excluded if it is otherwise relevant and admissible.” 
People v. Smith
, 141 Ill. 2d 40, 58 (1990). In some circumstances, evidence of gang affiliation is sufficiently probative of bias to warrant its admission on cross-examination. See 
United States v. Abel
, 469 U.S. 45, 52, 83 L. Ed. 2d 450, 457, 105 S. Ct. 465, 469 (1984) (“A witness’ and a party’s common membership in an organization *** is certainly probative of bias”); 
People v. Roman
, 248 Ill. App. 3d 1085, 1086 (1993) (“A clear motive to lie could be shown when considering that two of the identifying witnesses were part of a rival gang”).

In 
People v. Gonzalez
, 104 Ill. 2d 332 (1984), the defendant was charged with first degree murder. The State made a motion 
in limine
 to bar cross-examination of one of its two occurrence witnesses on the subject of gang affiliation. The defendant argued that such evidence was necessary to his defense. The defendant theorized that the key witness fabricated his testimony in order to retaliate against the defendant for recently quitting the gang or to shift prosecutorial attention from the witness, who was present at the murder scene, to the defendant. The trial court granted the State’s motion, barring all gang-affiliation evidence.

We held that the trial court improperly limited the defendant’s cross-examination as to the witness’ bias or motive to testify falsely. 
Gonzalez
, 104 Ill. 2d at 337. We rejected the State’s contention that gang-affiliation evidence was collateral to the identity of the shooter because the defendant asserted that he was being framed by the State’s witness. 
Gonzalez
, 104 Ill. 2d at 338. We also rejected the State’s contention that the court’s ruling did not limit the defendant’s ability to cross-examine the witness about his motive to testify:

“Gang affiliation and the concerted activity of the gang in threatening the defendant and harassing his family formed the very basis of the defense theory, however, and neither in their briefs nor at oral argument did the State suggest just how defense counsel could have framed questions designed to elicit the necessary information without reference to gang membership and activities.

Questions regarding [the witness’] gang activities and threats against the defendant were clearly relevant to the reliability of [the witness’] testimony, and should have been allowed.” 
Gonzalez
, 104 Ill. 2d at 338.

We concluded that the trial court’s error was not harmless beyond a reasonable doubt. 
Gonzalez
, 104 Ill. 2d at 338. The error may have contributed to the defendant’s conviction; the State’s other evidence did not overwhelmingly support the conviction; and the gang-affiliation evidence was not cumulative or duplicative because the court barred all gang evidence. 
Gonzalez
, 104 Ill. 2d at 339.

The Seventh Circuit Court of Appeals reached a similar result in 
Clark v. O’Leary
, 852 F.2d 999 (7th Cir. 1988). In 
Clark
, the defendant was convicted in the Cook County circuit court of first degree murder and attempted murder. He filed a 
habeas corpus
 petition in federal court alleging that his confrontation clause rights were violated when the state trial court granted the prosecution’s motion 
in limine
 to exclude references to gang affiliation as irrelevant. The defendant asserted that the State’s two key occurrence witnesses, who were also shooting victims, were members of a rival gang with whom the defendant had an altercation on the day of the murder. At trial, the defendant relied on an alibi, and the only testimony placing the defendant at the crime scene came from these two gang rivals. Bias and prejudice purportedly emanated from “inter-gang animosity.” 
Clark
, 852 F.2d at 1001.

The Seventh Circuit acknowledged that the confrontation clause allows restrictions on cross-examination if the questions are irrelevant or collateral. 
Clark
, 852 F.2d at 1004. The court noted, however, that under 
Davis

“defense counsel must be permitted to present its bias evidence within the context of the defense theory. [Citation.] Because the defense theory was based on alibi, the potential motive of the State’s witnesses to fabricate their alleged observation of [the defendant] at the scene of the crime had to be examined. The relevance of any gang affiliation of identification witnesses would be apparent, for besides any allegiance to other members, the potential threat of physical reprisals for testifying otherwise certainly could have motivated these witnesses to concoct a story to ‘get’ rival gang members [the defendant] and his co-defendants. Yet no such questions regarding threats were permitted.

The trial court here wrested the role of fact finder from the jury by preliminarily screening the credibility of the witnesses, stating ‘Well, gang membership, even though it probably should be a felony, isn’t. And so–and it is nothing that–that affects one’s credibility.’ [Citation.] This assertion of the court was a constitutional error, permitting the State to present its case without having its only observation witnesses properly confronted.” 
Clark
, 852 F.2d at 1006.

The court then turned to the harmless-error factors identified by the Supreme Court in 
Van Arsdall
. 
Clark
, 852 F.2d at 1007. The witnesses’ identification testimony was vital to the State’s case; the testimony was not cumulative; the State offered no evidence to corroborate the witnesses’ testimony; defense counsel’s cross-examination was limited to routine matters of perception, recall, and prompting by the State; and the State’s case was weak without testimony from these witnesses. 
Clark
, 852 F.2d at 1007-08. The court concluded that this error was not harmless beyond a reasonable doubt. 
Clark
, 852 F.2d at 1008.

Like the witnesses in 
Gonzalez
 and 
Clark
, Taylor, Myrick, and Blakemore provided crucial links proving the State’s case, and their gang affiliation was relevant to their credibility. The trial court’s 
in limine
 ruling, which cut off all cross-examination on gang rivalry, unreasonably limited the defense from exploring these witnesses’ bias. This error was not harmless beyond a reasonable doubt.

Taylor, Myrick, and Blakemore were three of the State’s five occurrence witnesses, and their testimony was not cumulative of testimony from the State’s other occurrence witnesses, Hall and Pane. When the shooting began, Hall was standing inside the cashier’s booth, and Pane was working across the street, but Taylor, Myrick, and Blakemore were standing outside when the shooting began. Taylor saw the argument and the shooting from behind his car, and Myrick saw the argument and shooting only as a reflection in the window of the cashier’s booth. Blakemore was the only witness with a clear view of Moret and the defendant. Additionally, their testimony, though corroborated by Hall and Pane on some points, was contradicted on others–whether the defendant’s van was already parked at the station when Taylor’s car arrived, whether Moret had money in his hands before the shooting, and whether Taylor, Myrick, and Blakemore touched Moret’s body after the shooting.

At trial, although the defense was allowed to cross-examine these witnesses on their prior convictions, which the State discussed on direct, the remaining cross-examination was routine. Defense counsel was unable to leave an impression of bias with the jury. These witnesses testified that they were friends with Moret, but the only evidence of gang rivalry came from the defendant. Finally, the State’s evidence supporting first degree murder was strong, but not overwhelming.

The State contends that gang-affiliation evidence was inadmissible under 
People v. Lynch
, 104 Ill. 2d 194, 200 (1984), in which we held that “when the theory of self-defense is raised, the victim’s aggressive and violent character is relevant to show who was the aggressor.” 
Lynch
, however, is inapposite. The State concedes, and we agree, that the defendant’s evidence generally showed the rivalry between the Dog Pound and the defendant’s gang. The defense sought to use this evidence to expose the witnesses’ potential bias against the defendant, not to show Moret’s character.

The State also contends that we must balance the probative value of gang-affiliation evidence against its prejudice. In its motion, the State relied upon 
People v. Harris
, 262 Ill. App. 3d 35 (1994). In 
Harris
, the defendant was charged with attempted murder. On cross-examination, defense counsel asked the victim if he was a street gang member. The State objected, contending that irrelevant gang-affiliation evidence would confuse the jury. The defense responded that gang affiliation was relevant because the victim wanted to protect his cousin, a fellow gang member, who allegedly had a shotgun on the night of the shooting. In the absence of evidence linking the shooting to gang activity, the court sustained the State’s objection.

On appeal, the court acknowledged that “gang activity may be relevant to show bias against the defendant because the partiality of a witness is always relevant.” 
Harris
, 262 Ill. App. 3d at 47. The court held, however, that the trial court properly excluded such evidence after weighing its marginal relevance to the shooting against its potential to prejudice the State and confuse the issues, “where defendant had other alternatives which he used to discredit [the witness’] testimony.” 
Harris
, 262 Ill. App. 3d at 47. Accord 
People v. Rodriguez
, 291 Ill. App. 3d 55, 65 (1997) (upholding the trial court’s restriction of cross-examination because the relationship between gang membership and the shooting incident was “speculative at best”).

Unlike the defendant in 
Harris
, the defendant here had few alternatives to show witness bias. Additionally, the State’s concern with the accuracy of the gang-affiliation evidence was addressed in the defendant’s offers of proof. During trial, the defense made an offer of proof that Taylor would have testified he is a member of the Traveling Vice Lords street gang and that Henry would have testified Moret was also a member of the Traveling Vice Lords. The defense later made an offer of proof regarding the cross-examination of Blakemore. Defense counsel stated that he would have asked Blakemore about

“his membership in the Four Corner Hustlers, specifically membership in the Dog Pound subsidiary of the Four Corner Hustlers, their association with Louis Moret as a member of the Dog Pound, Travelling Vice Lords, the activities of the Dog Pound in *** the neighborhood surrounding specifically drug dealing and weapons, the occurrence of the shooting incident within the Dog Pound, and Disciples in that area at the time leading up to February 26, 1995.”

This presentation was sufficient to show the witnesses were rival gang members with a potential bias against the defendant. See 
Alford
, 282 U.S. at 692, 75 L. Ed. at 628, 51 S. Ct. at 219 (“It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop”).

The defendant asserts that gang-affiliation evidence had relevance beyond bias to show his perception of danger immediately before the shooting. According to the defendant, gang rivalry was the background against which he viewed his exchange with Moret. The State concedes that this evidence was admissible, but answers that allowing cross-examination on gang affiliation would have introduced a self-defense theory into its case in chief. The State asserts that the court’s 
in limine 
ruling affected only the defense’s cross-examination during the State’s case; the defendant could have called Taylor, Myrick, and Blakemore as witnesses during the defense case in chief.

We note that recalling a witness “is both inconvenient and inefficient” (T. Mauet & W. Wolfson, Trial Evidence §12.2, at 367 (2d ed. 2001)) and, in the context of a criminal trial, potentially fatal to the defense if the State’s witnesses become unavailable.

“Unless the question is vital and he is fairly confident of a favorable answer, the cross-examiner might be unwilling to run the risk of calling the adversary’s witness at a later stage as his own and will abandon the inquiry. Getting concessions from the opponent’s witness hot on the heels of the direct while his story is fresh is worth trying for. It is a much less attractive option to call an unfriendly witness later when his first testimony is stale.” 1 J. Strong, McCormick on Evidence §23, at 98 (5th ed. 1999).

Additionally, although cross-examination which ranges beyond the subject of direct examination to place the defense theory of the case before the jury is generally improper (see M. Graham, Cleary & Graham’s Handbook of Illinois Evidence §611.11, at 514 (7th ed. 1999)), the defendant may inquire into whatever tends to explain, qualify, modify, discredit, or destroy the direct examination testimony, even if the inquiry may incidentally constitute new matter which aids the defendant’s case. 
People v. Enis
, 139 Ill. 2d 264, 295 (1990); 
People v. Williams
, 66 Ill. 2d 478, 486 (1977); 
People v. Aughinbaugh
, 36 Ill. 2d 320, 325-26 (1967); 
People v. Morris
, 30 Ill. 2d 406, 409 (1964); see generally 1 J. Strong, McCormick on Evidence §21 (5th ed. 1999). Cross-examination on gang affiliation would have discredited the testimony from Taylor, Myrick, and Blakemore. The fact that this cross-examination may have incidentally furthered the defendant’s self-defense theory does not make it improper. 
Cf. People v. Lucas
, 132 Ill. 2d 399, 430 (1989) (“Evidence which is admissible for one purpose cannot be excluded for the reason that it would not be admissible for another purpose”).

Trial courts should hesitate before granting the State’s motion 
in limine
 “if the result will be, for all practical purposes, an evisceration of the defendant’s theory of the case.” 
People v. Prevo
, 302 Ill. App. 3d 1038, 1050 (1999). Although we do not reverse the defendant’s conviction for this reason, we observe that a more flexible approach to the scope of cross-examination sometimes may be preferable. See Fed. R. Evid. 611(b) (“Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. 
The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination
” (emphasis added)).

The remaining issues raised by the defendant are unlikely to recur on remand, and we decline to address them.

CONCLUSION

For the reasons we have discussed, we reverse the defendant’s conviction and remand for a new trial.

Reversed and remanded.

CHIEF JUSTICE HARRISON, specially concurring:

The proceedings below were fatally flawed for an additional reason not raised by my colleagues: they did not comport with the new rules enacted by our court governing the conduct of cases in which the State is seeking the death penalty. For the reasons set forth in my dissenting opinion in 
People v. Hickey
, No. 87286 (September 27, 2001) (Harrison, C.J., dissenting), the procedures contained in those rules are indispensable for achieving an accurate determination of innocence or guilt and are applicable to all capital cases now coming before us on direct review. Because Blue was tried, convicted and sentenced without the benefit of the new rules, his conviction and sentence could not be allowed to stand even if the errors identified by my colleagues were not present. For that reason, in addition to the reasons given by the majority, I therefore agree that Blue’s conviction and sentence should be set aside and that he should be granted a new trial.

On retrial, the State must proceed in accordance with our new rules. Whether those rules will be sufficient, by themselves, to place this state’s capital punishment system within the tolerances permitted by the state and federal constitution is a question we cannot yet answer. What is certain, however, is that no proceeding conducted without the benefit of the rules can be deemed reliable. As I discussed in my partial concurrence and partial dissent in
 People v. Bull
, 185 Ill. 2d 179 (1998), the present Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, §2) because it will inevitably lead to the execution of innocent persons. It is therefore void and unenforceable. Accordingly, if the State does not adhere to the new rules, and if Blue is convicted again, the State should not be permitted to seek the death penalty. 

JUSTICE KILBRIDE, also specially concurring:

I concur with the majority’s opinion and judgment. Nevertheless, in addition to the reasons set forth by the majority, I agree with Chief Justice Harrison that defendant’s convictions and sentence should also be set aside because the trial proceedings were not conducted in accordance with the new supreme court rules governing capital cases. As I stated in my dissents in 
People v. Hickey
, No. 87286 (September 27, 2001), slip op. at 39-43 (Kilbride, J., dissenting), and 
People v. Simpson
, Nos. 85084, 86926 (September 27, 2001), slip op. at 32-34 (Kilbride, J., dissenting), the procedures in capital cases prior to this court’s adoption of the new rules were inherently unreliable and did not sufficiently protect a defendant’s constitutional rights. Consequently, the rules, promulgated to help remedy the flaws of the old system, must be applied retroactively to all capital cases currently pending on direct appeal. See 
People v. Hudson
,195 Ill. 2d 117, 126 (2001); see also 
Griffith v. Kentucky
, 479 U.S. 314, 328, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 716 (1987). For this reason, as well as those reasons articulated by the majority, defendant’s retrial must proceed in compliance with the new rules.

JUSTICE THOMAS, dissenting:

The majority reverses defendant’s conviction and remands for a new trial on the ground that the trial court’s 
in limine
 ruling constituted prejudicial error. Because I believe that any error was, at most, harmless error, I dissent from the majority opinion.

In contrast to the majority, I believe this case is distinguishable from 
People v. Gonzalez
, 104 Ill. 2d 332 (1984), and 
Clark v. O’Leary
, 852 F.2d 999 (7th Cir. 1988). In 
Gonzalez
, the defendant claimed that one of the State’s witnesses fabricated his testimony identifying defendant as the shooter in order to “get” defendant for withdrawing from the witness’ gang. 
Gonzalez
, 104 Ill. 2d at 335. The trial court ruled that there would be no reference to gang affiliation in the case. 
Gonzalez
, 104 Ill. 2d at 335. This court agreed with the appellate court that the trial court’s restriction of gang evidence was reversible error, noting that there was little if any physical evidence linking the defendant to the shooting, and the remaining evidence consisted almost entirely of testimony from a witness whose testimony at trial differed from the report he had given to the police, and who had been sequestered in the State’s custody prior to trial with the gang member witness. 
Gonzalez
, 104 Ill. 2d at 339.

Likewise, in 
Clark
, the defendant, a gang member, claimed that the State’s witnesses, rival gang members, had lied in identifying defendant as the shooter in order to retaliate for an earlier altercation with defendant’s gang. 
Clark
, 852 F.2d at 1001. The trial court granted the State’s motion 
in limine
 to exclude all reference to gang affiliation. 
Clark
, 852 F.2d at 1001. The Seventh Circuit Court of Appeals found that the trial court had committed reversible error, noting that the State had relied entirely on the rival gang witnesses to place the defendant at the scene of the crime. 
Clark
, 852 F.2d at 1007.

Here, in contrast, even excluding the testimony of Taylor, Myrick and Blakemore, the three rival gang members, the evidence supporting defendant’s conviction was overwhelming. Terrance Hall, the attendant at the Amoco station, testified that while he was filling the defendant’s van with gas, a car containing the victim came into the gas station. Hall said that the victim got out of the car, approached the van, spoke to the van’s driver, then walked over toward the cashier’s booth. The defendant then walked toward the cashier’s booth and began arguing with the victim. As defendant and the victim were arguing, Hall returned to the cashier’s booth. Hall heard the men arguing about a woman, but heard nothing about gangs or drugs. The victim did nothing while he was arguing with defendant, although defendant became angrier as the argument continued. Hall did not see anything in the victim’s hands, and did not see the victim reach into his jacket or make any unusual movements with his hands. Hall said that defendant then shot the victim once, and pursued the victim as he turned to run and shot him again. The defendant continued to shoot the victim after the victim fell to the ground. The autopsy of the victim revealed 14 gunshot wounds.

The other witness that was not affiliated with any gang, Irma Pane, testified that she saw the victim get out of a car, stop for a moment to count money, then get in line at the cashier’s booth. She saw defendant’s van pull into the gas station and observed defendant get out of the van and go over to speak with the victim. Pane heard defendant call the victim a mother---, and saw defendant pull out a gun and shoot the victim. Pane never saw a weapon in the victim’s hands and never saw him reach for a weapon.

This court has recognized three approaches to determine whether an error is harmless beyond a reasonable doubt: (1) whether the error contributed to the defendant’s conviction; (2) whether the other evidence in the case overwhelmingly supported the defendant’s conviction; and (3) whether the excluded evidence would have been duplicative or cumulative. 
Gonzalez
, 104 Ill. 2d at 338-39, citing 
People v. Wilkerson
, 87 Ill. 2d 151, 157 (1981). In this case, each approach establishes that any error in this case was harmless beyond a reasonable doubt. First, because the testimony of Pane and Hall alone supported defendant’s conviction, it is unlikely that any error in restricting the cross-examination of the State’s other three witnesses contributed to defendant’s conviction. See 
People v. Smith
, 185 Ill. 2d 532, 541 (1999) (even testimony of single witness, if positive and witness is credible, sufficient to convict). Second, even excluding the testimony of those three witnesses, the evidence in the case was overwhelming. Both Hall and Pane testified that they never saw the victim with a weapon, nor did he ever appear to reach for a weapon, in contrast to defendant’s testimony that he shot the victim because he thought the victim was reaching for a gun. The testimony of Pane and Hall also negates any claim that the victim was threatening or aggressive, or that defendant and the victim were arguing over drugs. Further, although defendant claimed he acted in self-defense, the fact that he shot the victim 14 times, and continued to shoot even as the victim turned and ran, tends to belie defendant’s claim.

Third, and in contrast to 
Gonzalez
 and 
Clark
, the trial court in this case did not bar all evidence of gang affiliation, but in fact allowed defendant to testify that he and the victim were rival gang members and that the victim’s drug operation was located one block from defendant’s drug operation. Defendant also testified that Myrick and Blakemore were members of the gang that sold drugs with the victim. Defendant claimed that just prior to the shooting, the victim had accused defendant of shooting at the block where the victim sold drugs, which caused defendant to be apprehensive at the time of the shooting. Consequently, the excluded evidence of gang affiliation would have been duplicative of the evidence presented at defendant’s trial.

Because any error in restricting the cross-examination of the State’s witnesses concerning gang affiliation was, at most, harmless error, I dissent from the majority’s finding that defendant’s conviction should be reversed and remanded.

JUSTICE GARMAN joins in this dissent.

FOOTNOTES
1:     
1
See 
People v. Blue
, 189 Ill. 2d 99 (2000).