# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Chaban*, 2013 IL App (1st) 112588

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM CHABAN, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-11-2588 |
| Filed | August 6, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for the first-degree murder of his mother-in-law was upheld over his contentions that his wife's opinion about his guilt or innocence was improperly admitted, that the prosecutor's closing argument included misstatements of fact not based on the evidence, and that his guilt was not proved beyond a reasonable doubt, since any prejudice arising from his wife's testimony as a lay witness that she originally believed defendant killed her mother was reduced by her trial testimony that she believed he did not kill her, the prosecutor's closing arguments were based on reasonable inferences from the evidence and did not amount to error, and the ambiguities in the testimony concerning the DNA evidence did not create a reasonable doubt about defendant's guilt. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-20512; the Hon. Neera Walsh, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Kathleen T. Zellner & Associates, P.C., of Downers Grove (Nicholas Curran, of counsel), for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People. |

| Panel | PRESIDING JUSTICE HARRIS delivered the judgment of the court, with opinion. |
| | Justices Quinn and Simon concurred in the judgment and opinion. |

## OPINION

¶ 1    Defendant, William Chaban, appeals his conviction after a jury trial for first-degree murder and his sentence of 45 years' imprisonment. On appeal, Chaban contends (1) the trial court erred in admitting a lay witness's opinion on his guilt or innocence; (2) the trial court erred in denying Chaban's motion *in limine* to bar evidence of his alleged consciousness of guilt; (3) the prosecutor in closing argument made several misstatements of fact not based on the evidence which denied him a fair trial; and (4) the State did not prove him guilty beyond a reasonable doubt. For the following reasons, we affirm.

¶ 2                              JURISDICTION

¶ 3    The trial court sentenced Chaban on August 3, 2011. He filed a notice of appeal on August 19, 2011. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. R. 603 (eff. Oct. 1, 2010); R. 606 (eff. Mar. 20, 2009).

¶ 4                              BACKGROUND

¶ 5    Chaban was convicted of first-degree murder in the death of his mother-in-law, Irena Opalinska.[1] Prior to his trial, defense counsel filed a motion *in limine* to preclude the State from presenting evidence tending to show that Chaban and his wife, Dorota Opalinska, did not respond to police inquiries. The motion referred specifically to two episodes: the first episode took place from June 18, 2007, to June 29, 2007, during which time detectives made several phone calls to either Chaban or his wife but received no response in return; the

_____

[1]Although the State refers to the victim as "Irena" in the record, in its brief it refers to her as "Irina."

second episode occurred in September of 2007, after DNA evidence purportedly connected Chaban to the victim. On several occasions police made appointments to meet with Chaban but he never kept those appointments. Defense counsel argued that the trial court should not admit this evidence since at the time Chaban was unaware that he was the focus of the investigation. The State responded that Chaban was not the focus at the time because he initially lied to police, but nevertheless the evidence is probative of Chaban's consciousness of guilt. The court determined that the probative value of the evidence on the issue of Chaban's consciousness of guilt outweighed any unfair prejudice to him and allowed admission of the evidence.

¶ 6 At trial, Julie Mack testified for the State. Mack stated that in June of 2007, she and the victim, Irena, worked in the office of Dr. Neil Hagen. Dr. Hagen was an oral and maxillofacial surgeon, and Irena worked as his surgical assistant. Mack was the office manager. Mack testified that she trained Irena for the job, which involved preventing cross-contamination, ensuring the cleanliness of the office, setting up the necessary instruments, and prepping patients. Mack described Irena as "very particular and meticulous." Mack stated that she and Irena socialized outside of the office and talked on the phone "a couple times a week."

¶ 7 On Friday, June 15, 2007, Mack worked at Dr. Hagen's office until 1:30 to 2 p.m. When she left, Irena was still at work. Before leaving, Irena told Mack that she would call her later because they had made plans for her to visit Mack at her home around 9 a.m. on Saturday. Mack called Irena's home phone around 8 p.m. on June 15, and she left a message on Irena's answering machine. When Irena did not come to Mack's house on Saturday, Mack tried calling her home again but received no answer. She did not hear from Irena on Sunday or on Monday, June 18.

¶ 8 Dr. Hagen testified that he first met Irena in 1990 when she helped clean his home. After 10 years, Irena told Dr. Hagen that she could no longer do this kind of work and he offered to train her to work as a surgical assistant in his office. In June of 2007, Irena had been working in his office as a surgical assistant for about seven years. He described her as "the best assistant [he had] ever had." Irena was a diligent worker who never missed work without first contacting him. Dr. Hagen testified that although his office is not an operating room, it "function[s] in the same sterile fashion." Thus, he requires his surgical assistants "to, first thing in the morning, when they come in, wash their hands, forearms, fingernails. Be sure everything is thoroughly clean." Prior to each surgical procedure, the assistants must wash their hands before putting on gloves. After taking off the gloves, they wash their hands again because the gloves leave a "sticky film."

¶ 9 Dr. Hagen stated that Irena assisted him in two surgeries on June 14, 2007, and on June 15, 2007, she assisted him in five surgeries. He recalled that on June 15, 2007, Irena "uncharacteristically asked to leave early that day." Dr. Hagen said yes and she left around 3:30 p.m. When she left, she wore a sweater draped across her back with the sleeves crossed in the front. Dr. Hagen testified that he did not have office hours on June 16 or 17 so Irena was not scheduled to come into work on those days. However, Irena was scheduled to work on Monday, June 18. Dr. Hagen testified that Irena "always shows up by 7:00" on work days but on June 18, 2007, she did not show up for work. Dr. Hagen asked his wife to check on

Irena, since they were "quite close," and he subsequently learned that Irena was found dead in her condominium.

¶ 10    Detective Adam Katz testified that he is a violent crimes detective with the Chicago police department. On June 18, 2007, he was assigned to a death investigation at 6505 North Nashville. He walked into a bedroom and observed dark stains that appeared to be dried blood on the carpet. He saw a chair "that looked out of place" and noticed the bed had been moved because it appeared crooked. He saw pieces of hard black plastic and a black purse on the ground. He also observed some books and one slipper on the ground.

¶ 11    Detective Katz then went into the adjacent bathroom where he saw the victim, Irena, in the bathtub. He noticed the shower curtain "laying across the commode and the top of the bath." Irena was lying on her right side with her left arm over her head. Detective Katz also observed "a lot of blood in the bathtub" and blood on the ceramic tile walls of the bathroom. Detective Katz next walked through the condominium and noticed no unusual damage to the front door or sliding door to the patio. When crime lab technicians arrived on the scene, Detective Katz asked them to place bags on the victim's hands in order to preserve any DNA evidence from them.

¶ 12    The State asked Detective Katz to identify photographs of the crime scene. In one photograph, he identified Irena in the bathtub and noted that she was wearing a slipper on her right foot. He also noted the black sweater that was around her neck.

¶ 13    Detective Katz testified that he spoke with Irena's daughter, Dorota, when he was at the crime scene. Chaban was also at the scene. On July 20, 2007, he received information from forensic services that male DNA was recovered from Irena's fingernails. The police asked Chaban for a buccal swab, which he agreed to give. The swab was submitted for testing, and after receiving the test results, Detective Katz contacted Chaban by phone and set up an appointment for them to meet. Chaban, however, did not show up at the scheduled time so Detective Katz contacted him again to reschedule the meeting. Chaban did not show up for the rescheduled meeting either. Detective Katz testified that he attempted to contact Chaban by phone several more times but was unable to reach him. He stated that his "[m]essages weren't returned." On September 5, 2007, Detective Katz arrested Chaban as he was walking to the condominium at 6505 North Nashville.

¶ 14    On cross-examination, Detective Katz stated that no prints were taken from the front door or the patio door on June 18, 2007. Detective Katz stated that he did not form the opinion that the black sweater around Irena's neck was the murder weapon. He acknowledged that Chaban at the time was a resident of the Joliet area.

¶ 15    Detective Dino Amato testified that he works in the Chicago police department and primarily deals with violent crimes. On June 18, 2007, he was assigned to the second watch of an investigation at 6505 North Nashville. When he arrived at the scene, he observed that the condominium "appeared very normal. It was neat. The items within the apartment appeared to be largely undisturbed." He noticed valuables such as televisions and VCRs, and also noticed jewelry atop the bedroom dresser that "didn't appear disturbed." The dresser drawers were closed. He also observed that the front door and sliding door appeared normal, with no signs of damage or forced entry. The windows also appeared normal.

¶ 16       Around 4:20 p.m. that afternoon, he returned to the police station accompanied by Dorota and Chaban. He interviewed them separately in his office. He asked both their whereabouts around June 12, 2007. Chaban answered that on June 12, they had returned from their vacation in Las Vegas, where they were married. On June 13, 2007, he and Dorota went to Irena's condominium and informed her of their marriage in Las Vegas. Chaban told him that when she learned of the marriage, Irena became very upset because it happened without her knowledge or consent. Irena told Chaban to sit in the hallway while she spoke privately to her daughter. Chaban also told Detective Amato that Irena did not like him because he was not of Polish descent. Irena and Dorota settled the matter in their conversation and he and Dorota left the condominium that night. Chaban told him that on June 14, 2007, he spent the entire day working at his auto detailing business in Lockport, Illinois. On June 15, he went to pick up Dorota from Northeastern University, where she attended school. They returned to Lockport and spent the evening watching movies with his family. When asked whether Chaban told him he was in Irena's condominium at any time on June 15, 2007, Detective Amato answered, "No, ma'am."

¶ 17       On June 16 and 17, Chaban worked with his father selling goods at a flea market, which he did on the weekends. Chaban told him that on June 18, 2007, he picked up Dorota at Northeastern and she told him that she had not heard from her mother and was concerned. After stopping to get a sandwich, they drove to Irena's condominium to check on her. They found her in the bathtub. After he interviewed Dorota and Chaban, Detective Amato drove them back to the condominium at 6505 North Nashville. On cross-examination, Detective Amato stated that Chaban was cooperative and answered his questions. On redirect, Detective Amato reiterated that Chaban never told him that he was at the condominium on June 15, 2007, or that his wife was there on that day. Detective Amato later learned that Chaban was in fact in the condominium on June 15, 2007.

¶ 18       Detective Tim McDermott testified that he works in the Chicago police department as a detective in the homicide unit. On June 18, 2007, he and his partner were assigned to assist the investigation at 6505 North Nashville. When he arrived on the scene, he observed no signs of forced entry. From June 18 to June 29, 2007, he tried to contact Dorota and Chaban by making daily phone calls. He received no response and his voicemails were not returned. After failing to contact them for two weeks, on June 29, 2007, he and two other detectives went to Irena's wake, where he found Dorota. While speaking to her about why she has not returned his calls, Chaban approached them. He was irate and demanded to know why Detective McDermott was interviewing Dorota. Detective McDermott explained that they needed to follow up with their investigation and contact family members, who were "important [in] bringing this matter to a conclusion." Chaban explained that he had not passed on the messages to Dorota because his wife was upset over her mother's death. Detective McDermott then gave them his contact information, as well as that of the two other detectives with him, before leaving the wake. Detective McDermott testified that from June 29, 2007, to the date Chaban was arrested, neither Chaban nor Dorota contacted him or the other detectives.

¶ 19       On cross-examination, Detective McDermott acknowledged that he did not submit his report of his interview with Dorota on June 29, 2007, until December of 2007. He also

testified that his report did not contain any statements about Chaban not contacting detectives from June 29 to the date of his arrest.

¶ 20    Dr. Joseph Cogan testified that he works as a pathologist at the Cook County medical examiner's office. On June 19, 2007, Dr. Cogan performed Irena's autopsy and recorded his findings in a protocol report. He performed both an external and internal examination of the body. The external examination revealed "a lot of bruises" and a set of injuries on her upper back, "over the scapula, on the right and left sides." The injuries to the back were symmetrical, which Dr. Cogan found "a little bit strange." He observed 12, maybe 13, points of injury including contusions and abrasions on the top of the head, as well as on the left side and back of the head, and the forehead area. He stated that these injuries were associated with a fair amount of hemorrhage. Dr. Cogan also observed an internal injury to the brain, a subarachnoid hemorrhage. Such hemorrhaging occurs when there is some trauma that breaks the blood vessels in the thin arachnoid layer that covers the brain, and blood leaks into that area. Dr. Cogan found that Irena's major organs, such as her heart and lungs, were in good shape.

¶ 21    Dr. Cogan testified that Irena's injuries were found on the upper chest, neck and head area, which raised "a great deal of suspicion" in his mind. He explained that injuries from an accidental fall would generally be confined to one surface of the body, like a bruise to a knee or elbow. When these injuries occur in different locations as on Irena's body, it is an indication of an inflicted injury consistent with being attacked. Dr. Cogan stated that he suspected homicide at the time, but he reserved until later his ruling on the cause of death. Although Irena's inflicted injuries were serious, "they didn't seem to be the striking blow or the killing–a killing injury."

¶ 22    Since he was not clear on the cause of death, Dr. Cogan wanted to consult with the police. Dr. Cogan reviewed police photographs of Irena as she was found at the scene of the crime. In the photographs, Dr. Cogan saw the sweater wrapped around Irena's neck and it came to him that "the sweater explains the cause of death." He also had the opportunity to examine the sweater. The silk sweater was "very elastic and soft, and could be used as a ligature to the neck." In that case, it would leave very little to no injury in the soft tissue of the neck where normally one observes injuries from strangulation. An attacker using the sweater to strangle Irena also explained the symmetrical bruises found across the scapula. The injuries "would be consistent with somebody pulling from behind, possibly using her own body to get that tension on the sweater around her neck."

¶ 23    He explained that these types of strangulations with no external markings on the neck are often found in jail hangings "where people use pieces of their garments or torn up sheets to make a noose." No deep hemorrhaging occurs. However, one does often find petechiae hemorrhaging, which occurs when strangulation stops the blood from coming out of the head and toward the heart. The resulting pressure builds in the small blood vessels, which burst, leaving "just a small pinhead size of blood." Petechiae hemorrhaging can be seen in people with fair skin or in the conjuctiva of the eyes. However, Dr. Cogan did not observe this hemorrhaging in Irena because her body was in a state of decomposition where the blood had been broken down. Dr. Cogan could not give a precise time of death; however, he determined that "from the state of decomposition, [it] looks like it's probably more than 24 hours."

-6-

¶ 24 Based on all of this information, Dr. Cogan formed an opinion within a reasonable degree of medical certainty that the cause of Irena's death was strangulation, with blunt force injuries as contributing factors. The manner of death was homicide.

¶ 25 On cross-examination, Dr. Cogan was presented with the initial death certificate issued for Irena. It listed her cause of death as status asthmaticus, which would indicate the person died in a severe asthmatic attack. Dr. Cogan stated that the death certificate listed an incorrect cause of death. He also stated that he informed the police that the cause of death was strangulation. Dr. Cogan testified that he found no horizontal circular wound from strangulation on Irena's neck, and no damage to the larynx or hyoid bone. When asked about a report which showed that a homicide occurred on June 18, 2007, at 12:40 p.m., Dr. Cogan responded that the time indicates when "the body is found."

¶ 26 On redirect examination, Dr. Cogan was presented with the handwritten death certificate he issued on September 5, 2007, listing the cause of death as strangulation. He did not issue the other death certificate, which was typed, listing the cause of death as status asthmaticus. He explained that when a cause of death is indicated, a clerk will look for it on a list of codes and type in the corresponding code number when typing out the certificate. When the code is typed, "the cause of death will appear typed out, on the death certificate." Dr. Cogan stated that the code for status asthmaticus is 0246 and the code for strangulation is 0249. He stated that the clerk made a typographical error in entering the code for cause of death on the first certificate. On recross, Dr. Cogan acknowledged that the date of death listed on the certificate was June 18, 2007.

¶ 27 The State then proceeded by way of stipulations. First, the parties stipulated that if called to testify, forensic investigators Susan Wolverton and Thomas Mander would state that they arrived at the crime scene at 6505 North Nashville around 3:20 p.m. on June 18, 2007. They photographed the scene, collected and inventoried evidence, and took swabs of stains and blood. "They would testify that they followed the proper police procedures and maintained a proper chain of custody at all times." Next, the parties stipulated that if called to testify, Chicago police evidence technician Victor Rivera would state that on June 19, 2007, he received an assignment to transport evidence from the medical examiner's office. He would testify that he inventoried the evidence after following proper procedures and maintained a proper chain of custody at all times.

¶ 28 The parties also stipulated that if called to testify, Mike Skorek would state that he works for the Chicago police and is trained in obtaining buccal swabs. He would testify that on July 31, 2007, he took a buccal swab from Chaban at 6505 North Nashville. He followed proper police procedures by swabbing the inside of Chaban's mouth and sealing the swabs in an envelope. He inventoried the swabs and sent the sealed swabs to the crime lab for testing and analysis. He would testify that he maintained a proper chain of custody at all times.

¶ 29 The State then called its next witness. Megan Neff testified that she works as a forensic scientist for the Illinois State Police. She performs biological testing of evidence received from police agencies and issues a report based on her findings. As part of her duties, she conducts DNA analysis on materials she receives. In forensic DNA analysis, she obtains DNA profiles from the material as well as from standards obtained from persons involved

in the case. She then compares the profiles and determines whether a person could or could not be the donor of the material.

¶ 30     Neff testified that she conducted blood testing on the following exhibits: a metal bracket, and swabs from stains found on the bedroom carpet, the west bathroom wall by the water control handle, the west bathroom wall by the faucet, and the south bathroom wall. She also collected material from Irena's fingernail clippings. She received a standard from Irena and a standard from Chaban.

¶ 31     Neff found that the swabs collected from the carpet contained a partial human female profile, and Irena could not be excluded from that profile, meaning the DNA could have belonged to Irena. The swabs taken from the bathroom walls matched the DNA profile of Irena. Neff also tested the material in Irena's fingernails from her left and right hands. The amount of material from the left hand was not sufficient to develop a DNA profile, although Neff did detect a male profile in the sample. The material from the right hand contained a "[m]ixture of DNA profiles," which Neff separated into a major and a minor profile. Major means that the profile is at a "much higher level" than the minor profile. Neff testified that she identified the major profile as a male profile which matched the DNA profile of Chaban. The minor profile was a partial female profile from which Irena could not be excluded. Neff stated that in testing fingernail clippings from an individual, she would expect to find the individual's profile on that sample. Neff determined that "the major human male DNA profile identified [from fingernail clippings of the right hand] would be expected to occur in approximately 1 in 3.8 quadrillion black, 1 in 2.1 quadrillion white or 1 in 12 quadrillion hispanic unrelated individuals."

¶ 32     Neff testified that since the male profile was the major profile, it "was at a more significant level than the minor profile," indicating "close personal contact of some sort." She opined that "it's possible that the DNA got there from a struggle."

¶ 33     On cross-examination, Neff stated that "[i]t is possible that the cells can get there through non violent contact as well." Neff acknowledged that the DNA material found under the nails could have been present for a day or a month. Neff further stated that "[i]t is possible that normal hand washing can remove DNA, but there are no rules on this. There are no rules that state if you wash your hands X amount of times the DNA will be removed from the nails. It's possible after hand washing the DNA can still be there." On redirect, Neff stated that once DNA has been transferred under the fingernails through contact, "[i]t is possible over time that the DNA could come out. It's possible for it to stay there as well." When asked whether repeated hand washing could remove DNA from underneath the fingernails Neff responded, "It is possible."

¶ 34     The parties stipulated that if called to testify, Peggy Konrath, a forensic scientist with the Illinois State Police crime lab, would state that she conducted a latent fingerprint analysis on one piece of metal and four pieces of black plastic. Her examination did not reveal any latent impressions suitable for comparison.

¶ 35     The State then called Dorota as a witness. She stated that she is the daughter of Irena and is married to Chaban. She also acknowledged that she was charged, prosecuted and convicted of perjury and obstruction of justice in Irena's murder investigation. Dorota testified that her

mother was killed on June 15, 2007, and that she lied to police during the investigation. When asked whether she lied to protect Chaban because "back in June of 2007 you believed your husband murdered your mother" Dorota answered, "In 2007, yes, I believed." When asked whether she now believed her husband killed her mother Dorota responded, "No, I don't believe that he did it." Dorota explained that in 2007, she was pressured by the police and confused. She stated that she was still in shock over her mother's death.

¶ 36    Dorota stated she and Irena had "a normal mother and daughter relationship." When she first began dating Chaban, Irena did not approve. However, after talking to him and getting to know him, she came to accept him. When Dorota and Chaban decided to marry, they did not inform Irena. Instead, they took Irena's car without telling her and drove to the airport for a flight to Las Vegas. They came home on June 12, 2007, and saw Irena on June 13 at her condominium. They told her about their marriage and she was "a little bit upset" and angry. Chaban was asked to leave while she and Irena had a discussion. Dorota testified that her mother was upset that she got married without telling her and felt that Dorota was too young to be married. Irena was also upset that they took her car, which left her without one. After the conversation, Dorota and Chaban again took Irena's car and left the condominium.

¶ 37    Dorota stated that she did not see her mother on June 14 or 15. She testified that on June 15, she went to school and then came back to the condominium to pack some of her things so she could stay with Chaban. She acknowledged that when first interviewed, she said that she was not at the condominium on June 15. Although Dorota stated that on June 15, Chaban and her mother were getting along, when confronted with her testimony that she believed her husband was angry with her mother on June 15, Dorota agreed she gave that response.

¶ 38    While at the condominium on June 15, Dorota spoke by phone to Jenny Jurczak, a community college friend. She spoke a bit about the fact Irena and Chaban did not get along. Dorota acknowledged that she had called her mother "[a] fucking bitch" because Irena and Chaban were not getting along. Dorota stated that she expected Chaban at the condominium on June 15 because he was to help "get [her] stuff out of the condominium." She did not remember at what time he arrived at the condominium, or whether she was on the phone with Jurczak when he arrived. When confronted with her earlier testimony, Dorota acknowledged that when asked whether Chaban was in the condominium after 2 p.m., and whether he spoke briefly with Jenny on the phone, Dorota answered, "Yes." Dorota stated that after they left the condominium, she and Chaban checked into a motel. She acknowledged that on September 6, 2007, in her testimony before the grand jury, she stated that she could not remember anything that happened on June 15, 2007, after 2 p.m., or on June 16 or 17. She did remember the events of June 18, however.

¶ 39    On Monday, June 18, 2007, Dorota returned to the condominium around noon to check on her fish and because she could not get a hold of her mother. She could not remember how long it had been since she last had contact with her. Dorota was aware that her mother worked on Mondays but she did not check on Irena at work. She stated that blood was found in her bedroom where she had been with Chaban on June 15 to pack up her things. Her mother's body was found in Dorota's bathroom. Dorota acknowledged that she and Chaban moved into the condominium shortly after her mother's death. Dorota stated that she did not contact police to inquire about the investigation because she was scared and "shaken up."

Dorota acknowledged that in earlier testimony when asked whether she stood to gain "[a] lot of money" from Irena's estate she answered, "I believe so, yes." During cross-examination, Dorota stated that when she and Chaban first walked into the condominium on June 13, 2007, to tell Irena of their marriage, Irena embraced both Dorota and Chaban.

¶ 40 Jennifer Jurczak testified that in June of 2007, she lived in Illinois and attended Oakton Community College, where she met Dorota. She sometimes visited Dorota in the condominium on Nashville, where Dorota lived with Irena. On June 15, 2007, around 1:45 p.m., Jurczak spoke on the phone with Dorota, who called Jurczak from the condominium's landline. They spoke for about 40 minutes before hanging up. They spoke again by phone later, around 3:30 p.m. While they were speaking, Dorota had to put down the phone so she could answer the door. Jurczak could hear a male voice she recognized as Chaban's, as well as Dorota's voice in the background. When Dorota got back on the phone, Jurczak asked to speak with Chaban. They spoke a few minutes about setting up a double date with one of Chaban's single friends. While Jurczak was speaking with Chaban, she heard Dorota tell him that they "have to take care of something" after which she and Chaban said good-bye and hung up the phone.

¶ 41 The State rested and defense counsel moved for a directed finding. The trial court denied the motion. The defense rested its case without calling any witnesses or presenting any evidence, and renewed the motion for a directed finding. The trial court denied the motion. Before closing arguments, defense counsel renewed its prior objection to testimony elicited from Dorota about her prior belief that Chaban killed her mother. The trial court denied the motion, finding the testimony goes to Dorota's motive, bias, and interest in testifying. The trial court then allowed the State to reopen its case to enter a stipulation. The parties stipulated that Dorota testified at trial under a grant of immunity by the State's Attorney's office. The order was read to the jury. The jury found Chaban guilty of first degree murder against a person 60 years of age or older, and the trial court subsequently sentenced him to 45 years' imprisonment. Chaban filed this timely appeal.

¶ 42 ANALYSIS

¶ 43 Chaban first contends that the trial court erred in allowing opinion testimony Dorota gave in June of 2007 indicating she believed Chaban had killed her mother. Generally, a lay witness must testify only to facts of which she has personal knowledge. *People v. Brown*, 200 Ill. App. 3d 566, 578 (1990). Therefore, a lay witness may not testify as to her opinion or make inferences from the facts. *People v. Crump*, 319 Ill. App. 3d 538, 542 (2001). If a lay witness does offer improper opinion testimony, it is considered "especially improper and prejudicial when it goes to the ultimate question of fact to be decided by the jury." *People v. McClellan*, 216 Ill. App. 3d 1007, 1013 (1991). The determination of whether evidence is relevant and admissible is within the trial court's discretion and this court will not overturn that decision absent an abuse of discretion. *People v. Morgan*, 197 Ill. 2d 404, 455 (2001). An abuse of discretion occurs when the trial court's determination is arbitrary, fanciful or unreasonable. *Id*.

¶ 44 In *Crump*, a case on which Chaban relies, the prosecutor asked a police officer whether,

-10-

during the course of the investigation, he had reason to believe that the defendant committed the offense and the officer answered, " 'Yes, I did.' " *Crump*, 319 Ill. App. 3d at 540. The court held that the opinion testimony was improper and prejudicial because it addressed the ultimate fact question that the jury alone should decide. *Id*. at 544. It found the officer's statement especially prejudicial because "as an authority figure he was informing the jury that it should believe a portion of the prosecution's case." *Id*. The court reversed the defendant's conviction and remanded for a new trial. *Id*.

¶ 45 Crump is distinguishable from the case at bar. Here, no police officer testified that he believed Chaban killed Irena. Instead, Chaban challenges Dorota's testimony that in 2007 she believed he murdered Irena. This case is analogous to *People v. Hanson*, 238 Ill. 2d 74 (2010).

¶ 46 In *Hanson*, the defendant's sister, Jennifer, testified that when she spoke with Detective Nilles she told him that she believed defendant murdered their parents, their sister and her husband. *Hanson*, 238 Ill. 2d at 101. Detective Nilles also testified that when he spoke to defendant he told defendant, " 'Jennifer thinks you did this.' " *Id*. The defendant challenged both witnesses' testimony as improper opinion testimony. *Id.* The supreme court disagreed, reasoning that neither Jennifer nor Detective Nilles testified at trial that Jennifer believed defendant was guilty. Instead, they "testified to a statement which indicated, at the time the statement was made, that Jennifer thought defendant had caused the victim's deaths. At no time was any testimony offered as to Jennifer's present opinion of defendant's guilt or innocence." *Id*. Although it acknowledged that the defendant could arguably challenge the testimony based on relevancy and hearsay concerns, the supreme court "reject[ed his] argument that this testimony constituted improper opinion testimony." *Id.* The supreme court subsequently found the testimony admissible because it was relevant to provide a context for the police investigation and to show the defendant's state of mind in responding to police questioning, and it did not overly prejudice him. *Id*. at 102-03.

¶ 47 Here, the prosecutor questioned Dorota as follows:

"Q. And you lied to protect your husband. Correct?

A. I do believe I lied to the police officers, yes.

Q. Because back in June of 2007 you believed your husband murdered your mother. Correct?

A. In 2007, yes, I believed.

Q. And you believed he killed her in cold blood in her home. Correct?

A. If I may ask, is it right now that you are asking?

Q. Do you believe that?

A. That he killed her you are asking me?

Q. Yes.

A. No, I don't believe that he did it."

Defense counsel objected to this line of questioning and, after presentation of the evidence, moved to strike this portion of Dorota's testimony. The trial court denied the motion, finding that the testimony "goes to her motive, bias and interests in testifying."

¶ 48    Chaban specifically takes issue with the admission of Dorota's grand jury testimony that at the time she believed Chaban had killed her mother "in cold blood." Like the challenged statement in *Hanson*, this statement is not opinion testimony but rather indicates only that at the time Dorota made the statement in 2007, she believed Chaban had killed her mother. She never testified at trial that she now believes Chaban killed Irena. Therefore, the evidence is admissible if its relevance, or probative value, outweighs its prejudicial effect on Chaban. *Hanson*, 238 Ill. 2d at 101-02.

¶ 49    Dorota's credibility as a witness is a relevant concern. Her testimony in front of the grand jury differed at times from her testimony at trial, and some of her testimony was contradicted by the testimony of Jennifer Jurczak. The prosecutor elicited the testimony to show that Dorota had a motive to lie (to protect her husband) and that she did lie to police officers in 2007. In fact, Dorota was convicted of perjury and obstruction of justice. A witness's partiality is always relevant in determining his or her credibility and what weight to give the testimony. *People v. Sharrod*, 271 Ill. App. 3d 684, 689 (1995) (citing *Davis v. Alaska*, 415 U.S. 308, 316 (1974)).

¶ 50    We are also not persuaded that the testimony unduly prejudiced Chaban. Dorota testified at trial that in 2007 she stated that she believed Chaban killed Irena, but she now believes he did not kill Irena. Any prejudicial effect of Dorota's 2007 statement was lessened by her contradictory testimony at trial that she now believes that Chaban did not kill Irena.[2] The trial court's admission of the testimony as relevant was not an abuse of discretion.

¶ 51    Chaban disagrees, arguing that even if the testimony was relevant to show Dorota's bias, the trial court should have excluded it because the prejudicial testimony was cumulative of other properly admitted testimony. As support, he cites to *People v. Harris*, 262 Ill. App. 3d 35 (1994). However, the issue in *Harris* involved the trial court's exclusion of testimony indicating bias due to the witness's gang affiliation. *Id.* at 47. The court noted that "[e]vidence of gang membership is highly prejudicial and inflammatory." *Id.* Since the witness's gang affiliation was marginally relevant, the trial court properly excluded the gang affiliation testimony where its prejudicial effect outweighed its probative value, and defendant had used other evidence to discredit the witness's testimony. *Id.* Gang affiliation testimony is not an issue here.

¶ 52    Chaban argues, though, that the prosecutor increased the prejudicial effect of the 2007 statement in closing argument when he stated, "Dorota does not want you to know what she's always known and she told you. She was asked. Do you believe that man killed your mother in her home? She didn't want to say yes today." However, the prosecutor made these remarks in rebuttal only after defense counsel stated in his closing argument, "What we do know is [Dorota] is immunized. She was immunized. She could have said anything today and what

---

[2]Although Dorota's statement at trial that she does not believe Chaban killed Irena may qualify as opinion testimony, Chaban does not specifically challenge this statement in his brief and therefore has waived consideration of this issue on appeal pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008) ("[p]oints not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

she did was tell the truth." When defense counsel's closing argument provokes a response, "defendant cannot complain that the prosecutor's reply denied him a fair trial." *People v. Hudson*, 157 Ill. 2d 401, 445 (1993).

¶ 53 In footnote 2 of Chaban's main brief, he puts forth an additional argument that impeachment of Dorota using her 2007 statement is improper because a party may only impeach its own witness through use of a prior inconsistent statement when the testimony does "affirmative damage" to the party's case. As support he cites *People v. Cruz*, 162 Ill. 2d 314 (1994), for the proposition that "[i]t is insufficient that a witness merely disappoints the State by failing to incriminate defendant." Chaban does not elaborate on this argument or provide any further citations. We emphasize that " '[a] reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research.' " *In re Marriage of Auriemma*, 271 Ill. App. 3d 68, 72 (1994) (quoting *Thrall Car Manufacturing Co. v. Linquist*, 145 Ill. App. 3d 712, 719 (1986)). An issue not clearly defined or adequately presented may be deemed waived. *Id*. In any event, testimony that does " 'affirmative damage' " to the examiner's case renders the case "worse off than if the witness had not testified." *Cruz*, 162 Ill. 2d at 360. Here, Dorota's testimony that she now believes Chaban is innocent renders the State's case worse off than if she had not made that statement.

¶ 54 Chaban next argues that the trial court erred in denying his motion *in limine* to exclude evidence that he failed to return phone calls from the police and did not keep appointments to meet with the police. The trial court's ruling on a motion *in limine* goes to its discretion to include or exclude evidence. *People v. Williams*, 188 Ill. 2d 365, 369 (1999). This court will not overturn the trial court's grant or denial of a motion *in limine* absent an abuse of discretion. *Id*.

¶ 55 Chaban contends that an inference of guilt may be drawn from evidence of his flight, but only if he had knowledge at the time that he was a suspect, citing *People v. Harris*, 23 Ill. 2d 270, 273 (1961), and *People v. Lewis*, 165 Ill. 2d 305, 350 (1995). He argues there is no evidence he was aware at the time that he was a suspect in Irena's death. However, *Harris* involved the defendant's flight to Georgia and *Lewis* involved a defendant who abruptly moved out of his apartment and could not be located. Unlike the defendants in *Harris* and *Lewis*, Chaban never fled the jurisdiction and was in fact found at Irena's condominium when police arrested him. Testimony that Chaban failed to return police phone calls or keep appointments to meet with the police more likely evidences an attempt to obstruct an investigation. Such evidence is relevant to show a defendant's consciousness of guilt. *People v. Rojas*, 359 Ill. App. 3d 392, 404 (2005).

¶ 56 Chaban disagrees, arguing that his actions did not indicate a conscious attempt to avoid police. He points out that he did voluntarily speak with police on the day Irena's body was found, and police successfully contacted him a number of times. He voluntarily submitted to a buccal swab. Furthermore, detectives scheduled the meetings to take place on the northwest side of Chicago and Chaban resided in Joliet. He argues that his "absence at the meetings is just as likely a product of the great distance he had to travel to get to the station as any consciousness of guilt." Although Chaban has provided alternative explanations for

his actions, or inaction, they do not render the evidence less relevant on the issue of Chaban's consciousness of guilt. It is the function of the fact finder to weigh the evidence, assess witness credibility, resolve conflicts in the evidence, and make inferences therefrom. *People v. Williams*, 193 Ill. 2d 306, 338 (2000). The trial court did not abuse its discretion in denying the motion *in limine* and admitting the evidence as relevant to show consciousness of guilt.

¶ 57    Chaban also challenges some of the prosecutor's remarks made during closing argument. He acknowledges that he has preserved review of only one of the comments by objecting to the remark at trial and including it in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Generally, this court can consider forfeited errors if (1) the evidence is so closely balanced that the error threatens to tip the scales of justice against the defendant; or (2) the error is so serious that it affects the fairness of defendant's trial. *People v. Sargent*, 239 Ill. 2d 166, 189 (2010). Chaban contends that this court should consider his claims of error because the evidence was closely balanced and the challenged remarks addressed "the only direct evidence of [Chaban's] guilt." However, we must first determine whether any error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 58    A prosecutor has wide latitude in closing arguments and may comment on the evidence and any reasonable inferences therefrom. *People v. Perry*, 224 Ill. 2d 312, 347 (2007). Furthermore, upon review this court considers the challenged remarks in the context of the entire record, particularly the closing arguments of both sides, as a whole. *People v. Williams*, 313 Ill. App. 3d 849, 863 (2000). If the prosecutor made the challenged comment in rebuttal, a defendant cannot complain if defense counsel comments clearly invited a response. *People v. Brown*, 172 Ill. 2d 1, 43 (1996). We note that our supreme court in *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), applied a *de novo* standard in reviewing the issue of prosecutor comments in closing argument. However, in *People v. Blue*, 189 Ill. 2d 99, 128 (2000), a case cited by *Wheeler*, our supreme court applied an abuse of discretion standard of review. We need not resolve the issue of the appropriate standard of review at this time since our determination would be the same under either standard.

¶ 59    Chaban takes issue with the following prosecutor comments made during closing argument:

> "What's more important is his DNA is the significant DNA under her own fingernails which means there is more of his DNA under her fingernails than her own DNA.
>
> * * *
>
> It happens that he is the significant DNA underneath her fingernails because he is the last person that she touches before she drops dead in that tub ... And her nails are going up against part of his body and she is getting his cells underneath her nails. That's how you get significant portion of DNA underneath her nails.
>
> * * *
>
> Remember when you go back there and you examine that evidence, there is the significant DNA underneath her nails. He can't get away from that. His is the significant portion underneath her own nails and he didn't have contact with her from the Wednesday all the way to the Friday?
>
> * * *

She was obtaining a significant portion of his DNA, a significant portion of DNA that would remain underneath her nails and that's something he can't get away from."

¶ 60 Chaban argues that these comments misstate the evidence by claiming that a significant amount of his DNA was recovered from under Irena's fingernail where no evidence of the actual amount of DNA obtained was presented at trial. He further argues that the comments improperly infer that the significant amount of DNA found was indicative of a struggle.

¶ 61 However, a careful reading of the comments shows that the prosecutor was simply arguing that Chaban's DNA was the majority profile in the sample obtained from under Irena's fingernail, using the word "significant" because Neff used that word in her testimony. Neff testified that the material from the right hand contained a "[m]ixture of DNA profiles" which she separated into a major and a minor profile. Major means that the profile is at a "much higher level" than the minor profile. She identified the major profile as a male profile which matched that of Chaban. The minor profile was a partial female profile from which Irena could not be excluded. Neff stated that in testing fingernail clippings from an individual, she would expect to find the individual's profile on that sample. Furthermore, she stated that since the male profile was the major profile, it "was at a more significant level than the minor profile" indicating "close personal contact of some sort." She opined that "it's possible that the DNA got there from a struggle." We find no error since the prosecutor simply commented on the evidence at trial. See *Perry*, 224 Ill. 2d at 347.

¶ 62 Chaban also challenges the following prosecutor comments made during rebuttal argument:

"The fingernail clippings, the fingernail clippings, that had his DNA underneath them, significant amounts of DNA. How do you think using your common sense a person would get more DNA from someone else other than yourself underneath your fingernails? A struggle? Maybe if you are fighting for your life? Someone is attacking you and you are trying to save your life so you are fighting. (Chaban objected to this comment, and the trial court overruled the objection)

\* \* \*

You don't need to be an expert from the Illinois State Police crime lab to use your common sense, to know how someone else's DNA in that amount would get under a person's fingernails. It was the human male DNA profile would be expected to occur in 1 in 3.8 quadrillion black, 1 in 2.1 quadrillion white and 1 in 12 quadrillion Hispanic unrelated individuals; 15 zeros behind 1 quadrillion. That's how much of his DNA was underneath her fingernails.

\* \* \*

She is neat. You are telling me that this magical DNA that he's got from some possible embrace that we don't even know what it was 48 hours earlier and 6 surgeries before that is stuck underneath her fingernails to the point there is more of that than even her own DNA? That defies common sense."

¶ 63 Although the prosecutor in rebuttal does refer to the amount of DNA as significant, a review of the closing arguments as a whole shows that he was responding to defense counsel's comments about the amount of DNA obtained from Irena's fingernails. Defense

counsel argued in closing argument that Chaban's DNA found under Irena's fingernail was deposited there on June 13, and not on June 15, the alleged date of Irena's death:

> "Then why is there so little DNA on one hand? Obviously that degraded away. That went away from the washing. The fact that this tiny, tiny, smaller than a cell was present in her hand, in her nails, if you look at People's 49, you will see pictures of the longer nails. The fact that it's present [at all] is proof that this is the DNA from the 13th, in my humble opinion."

Prosecutors may respond when defense counsel's arguments clearly invite a response. *People v. Evans*, 209 Ill. 2d 194, 225 (2004). Furthermore, in closing argument a prosecutor may challenge the defense's characterizations of the evidence, and comment on the persuasiveness of the defense. *People v. Jones*, 156 Ill. 2d 225, 252 (1993). We do not find these comments by the prosecutor improper.

¶ 64 Chaban also argues that the following prosecutorial comment was improper because it was not based on competent evidence:

> "How about the fact that she (Dorota) was to profit from the life insurance policy; not him but Dorota. Isn't that what she testified to? Indirectly, isn't he going to get that money?...There's plenty of motive in this case, folks."

At trial, Dorota was questioned as follows:

> "Q. And you stood to gain a lot of money from your mother when she died, didn't you?
>
> A. I don't know.
>
> Q. You don't know that you were supposed to get money from your mother if she died?
>
> A. No.
>
> Q. Counsel, page 31, line 12. 'Question: You stand to gain money though, isn't that right, from her estate? Answer: Yes. Question: A lot of money. Right? Answer: I believe so, yes.' Those were the questions you were asked and those were the answers you gave under oath. True?
>
> A. Yes."

¶ 65 Chaban argues that the prosecutor's reference to life insurance policy proceeds as a possible motive for Irena's murder was not based on the evidence and improperly bolstered the State's case. Although the testimony at trial did not refer specifically to life insurance policy proceeds, it did refer to "a lot of money" from Irena's estate that would go to Dorota if Irena died. The trier of fact may reasonably infer that life insurance proceeds are a portion of a deceased's estate. In any event, the testimony at trial was that Dorota stood to gain "a lot of money" upon Irena's death and whether that money comes from life insurance proceeds or from some other aspect of Irena's estate is irrelevant. The same inference that Chaban had a financial motive to kill Irena exists in both instances. A prosecutor may make reasonable inferences arising from the evidence, even if the inferences reflect negatively on defendant. *Perry*, 224 Ill. 2d at 347.

¶ 66 We find that the challenged comments were proper and therefore no error occurred.

¶ 67    Chaban's final contention is that the State's evidence was not sufficient to prove him guilty beyond a reasonable doubt. In reviewing a challenge to the sufficiency of the evidence, this court determines whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). It is the function of the fact finder to assess the credibility of witnesses, determine the weight given to testimony, and resolve conflicts or inconsistencies in the evidence. *People v. Naylor*, 229 Ill. 2d 584, 614 (2008). Expert witness testimony is subject to the same weight and credibility rules applied to evidence elicited from other witnesses. *People v. Horne*, 247 Ill. App. 3d 192, 198 (1993). Furthermore, it is not the function of this court to retry defendant or substitute its judgment for that of the trier of fact. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009).

¶ 68    The evidence at trial, viewed in the light most favorable to the prosecution, is as follows: Irena worked as a surgical assistant to Dr. Hagen. He testified that he kept his office in "the same sterile fashion" as an operating room, and thus required his assistants to "wash their hands, forearms, fingernails" prior to each surgical procedure. They also washed their hands after each surgical procedure to wash away the "sticky film" left by the surgical gloves they wore. Irena was a diligent worker who did not miss work without first notifying Dr. Hagen.

¶ 69    Irena did not approve of Dorota's relationship with Chaban. When they decided to marry, they did not inform Irena but instead took Irena's car without permission and drove to the airport to catch a flight to Las Vegas. They married and returned home on June 12, 2007. On June 13, they visited Irena and informed her of their marriage. Irena was upset and asked to speak with Dorota alone. Dorota returned to the condominium on June 15 to pack some of her things. She expected Chaban to come to the condominium that day to help "get [her] stuff out." She called her friend, Jenny Jurczak, while she was at the condominium. Jurczak testified that Dorota first called her from the condominium around 1:45 p.m. and they spoke for about 40 minutes before hanging up. Dorota spoke about how her mother and Chaban did not get along, and she called Irena "[a] fucking bitch." Dorota spoke to Jurczak again from the condominium around 3:30 p.m. While they were speaking, Jurczak heard a male voice in the background and asked if she could speak with Chaban. They spoke a few minutes about setting up a double date with one of Chaban's friends. Jurczak heard Dorota in the background telling Chaban they "have to take care of something" and Chaban said good-bye and hung up the phone.

¶ 70    On the last days Irena worked, she assisted in two surgeries on June 14, 2007, and five surgeries on June 15, 2007. On June 15, a Friday, Irena uncharacteristically asked to leave early, around 3:30 p.m. She also made arrangements to call Julie Mack, the office manager, that evening to confirm plans for Mack to visit the next morning. Irena never called Mack on June 15, nor did Mack reach her by phone when she tried calling Irena on the 15th, 16th, or 17th.

¶ 71    When Irena did not show up for work on Monday, June 18, Dr. Hagen became concerned and asked his wife to check on Irena. Irena was found dead in her condominium. Dr. Cogan

performed the autopsy on Irena and found inflicted injuries consistent with being attacked. However, these injuries did not seem to be "killing" injuries and after viewing photographs of Irena as she was found in the bathtub, he noticed the black sweater around her neck. He testified that strangulation using the sweater would leave very little to no injury visible in the soft tissue of the neck, and would also explain the symmetrical bruises he observed on Irena's back. The injuries "would be consistent with somebody pulling from behind." He formed an opinion within a reasonable degree of scientific certainty that the cause of Irena's death was strangulation, with blunt force injuries as contributing factors.

¶ 72    While investigating Irena's death on June 18, 2007, Detective Katz went into a bedroom in Irena's condominium and observed dark stains on the carpet. He saw a chair "that looked out of place" and the bed had also been moved because it appeared crooked. He observed pieces of black plastic, a black purse, and a slipper on the ground. In the bathroom where Irena was found, the shower curtain was "laying across the commode and the top of the bath." There was blood in the bathtub and on the walls in the bathroom. Irena was in the tub, wearing a slipper on her right foot, with a black sweater around her neck. Detective Amato testified that valuables found in the condominium appeared undisturbed, and the dresser drawers were closed. He noted that the front door and sliding door showed no signs of damage or forced entry.

¶ 73    Megan Neff testified that she tested samples taken from the stain on the carpet, the blood on the bathroom walls and in the tub, and from Irena's fingernails. Swabs taken from the bathroom matched Irena's DNA profile. The carpet stain contained a partial female profile from which Irena could not be excluded, meaning the DNA could have belonged to Irena. Material from fingernail clippings of Irena's right hand contained a mixture of DNA profiles which Neff separated into a major and a minor profile. A profile that is major is at a "much higher level" than the minor profile. Neff testified that the major profile matched the DNA profile of Chaban and the minor profile was a partial female profile from which Irena could not be excluded.

¶ 74    Neff further testified that since the male profile was the major profile, it indicated "close personal contact of some sort." She stated that "it's possible that the DNA got there from a struggle." The bedroom with blood stains on the carpet showed signs that Irena struggled with her attacker, as did the bathroom where Irena was found. Neff testified that DNA under the fingernails could be removed through repeated hand-washing.

¶ 75    The jury could reasonably infer from the evidence that Irena was killed some time after 3:30 pm on June 15, 2007. She was supposed to call Mack that evening about a visit the following day but Mack never heard from Irena. Mack tried to contact Irena on June 16 and June 17 but she never responded. The jury also could reasonably infer from Neff's testimony that since Irena had assisted in two surgeries on June 14, and five surgeries on June 15, thoroughly washing her hands before and after each surgery, the majority male DNA profile detected in the material from Irena's nails was deposited during Irena's struggle with her attacker some time after she left work at 3:30 pm on June 15. Dorota's and Jurczak's trial testimony placed Chaban in Irena's condominium some time after 3:30 pm on June 15, and Neff identified Chaban's profile as the significant DNA profile found under Irena's fingernails. Viewed in the light most favorable to the State, the evidence at trial supports a

finding of Chaban's guilt beyond a reasonable doubt.

¶ 76     Chaban disagrees, pointing to Neff's testimony at trial that DNA under the fingernails could be present for days or weeks, and is not necessarily removed by handwashing. Neff also acknowledged that DNA could collect under fingernails through nonviolent contact as well. Irena's body did not have defensive wounds indicative of a struggle. Chaban argues that his DNA could have been left from June 13, 2007, when he claimed he last had contact with Irena after he and Dorota returned from Las Vegas. Since no eyewitnesses identified Chaban as Irena's attacker, and Chaban made no inculpatory statements, he contends that this ambiguous DNA evidence is insufficient to support his conviction.

¶ 77     "Circumstantial evidence alone is sufficient to sustain a conviction where it satisfies proof beyond a reasonable doubt of the elements of the crime charged." *People v. Pollock*, 202 Ill. 2d 189, 217 (2002). Furthermore, any ambiguities in Neff's testimony does not render the evidence so unsatisfactory or unreasonable as to create reasonable doubt of Chaban's guilt. Rather, such infirmities go to the weight accorded her testimony which is a determination for the trier of fact. *People v. Peterson*, 171 Ill. App. 3d 730, 734 (1988). Although portions of Neff's testimony and other evidence supports Chaban's theory of the case, the jury "is not required to disregard inferences which flow normally from the evidence and to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Hall*, 194 Ill. 2d 305, 332 (2000). As discussed above, we find that the evidence was sufficient to prove Chaban guilty beyond a reasonable doubt.

¶ 78     For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 79     Affirmed.